THE UNITED STATES EXPRESS COMPANY V. T. J.
EVEREST.

No. 13,936.    (83 Pac. 817.)

SYLLABUS BY THE COURT.

NEGLIGENCE—*Injury to Telegraph Messenger—Liability of Express Company.*  Under the circumstances of this case it is *held,* that an express company engaged in unloading upon a truck express matter from a car standing upon a railroad-track in the union depot at Kansas City, Mo., was under no obligation to protect from injury, through a collision with the truck, a messenger of the Western Union Telegraph Company who was riding by permission of the pilot upon the steps of the rear car of an empty passenger-train backing into the depot upon an adjacent track which the truck obstructed.

Error from Wyandotte court of common pleas; WILLIAM G. HOLT, judge.  Opinion filed January 6, 1906.  Reversed.

*Karnes, New & Krauthoff, A. L. Berger,* and *Loomis, Blair & Scandrett,* for plaintiff in error.

*Getty, Hutchings & Dean,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: The plaintiff recovered damages for an injury to his seventeen-year-old son alleged to have been occasioned by the defendant's negligence. The injured party was a messenger of the Western Union Telegraph Company, whose duties required him to deliver messages in and about the union depot in Kansas City, Mo., and upon trains arriving and departing from that station, and to bring mail from the post-office, three blocks away.

On the morning of the accident he went to the post-office and received a bag of depot mail. Instead of returning by the usual route he went somewhat out of his way to the railroad-track used by the Chicago, Rock Island & Pacific Railway Company for access to

the depot.   There he found an empty train of that company waiting for a semaphore signal authorizing it to back into the depot to receive its load of passengers, baggage, express, and mail, preparatory to its departure westward.   As the train commenced to move backward after receiving its signal he climbed upon the rear steps of the rear car, and deposited his mailbag upon the platform.   The train was upon what is designated as track 5.   As it approached the depot a Chicago & Alton passenger-engine was discovered some 250 or 300 feet ahead, standing upon track 6 and emitting clouds of steam which obscured all further view in that direction.   This engine was attached to a late passenger-train, which had just arrived from the east.

Upon the arrival of trains the defendant's work of removing express matter from the cars begins, and employees are kept in waiting with trucks for that purpose.   Tracks 5 and 6 are parallel and lie next to each other, track 5 being nearest the depot building. The space between the tracks, however, is narrow, and a truck of standard size placed lengthwise alongside of an express car on track 6, in the usual manner for unloading, obstructs the operation of trains on track 5.   While one of the defendant's employees was engaged in taking express matter from the Chicago & Alton train referred to the rear of the Rock Island empty train emerged from the bank of steam and bore down upon his truck.   The messenger boy, standing upon the lower steps of the moving car, tried to climb up to the platform, but was too late.   The side of the car passed over the truck, and as it did so the truck carried away the car steps, and crushed the boy's foot so that amputation was necessary.

The plaintiff charged that the defendant was negligent in placing its truck upon track 5 at a time when the Rock Island train was due without stationing a sentinel to warn persons upon the train whose vision might be obstructed by the escaping steam of the pres-

Express Co. v. Everest.

ence of the truck. The defendant answered that it was not negligent; that it owed no duty to the boy at the time and place of the accident; and that his injuries were the result of his own carelessness.

The traffic in and out of the union station at Kansas City, Mo., is under the management of the Union Depot Company, which owns the buildings, grounds, and tracks. That company reserves to itself exclusive control over the entrance and exit of trains, and assigns to each railroad company using the depot a certain track for the purpose of loading and unloading its cars. The various express companies operate there under the same authority. There are no special instructions governing the use of tracks 5 and 6, but the servant of the defendant who was in charge of its truck at the time of the accident understands that trains have the right of way. No doubt this is true, since under all ordinary circumstances a truck ought not to block a train; and in any event it must be accepted as true for the purposes of this case. But the fact that the express company is required to remove its carriage in order that the railway company's carriage may pass does not render its occupancy of the track for the purpose of doing its work negligent merely because a train is due.

The two transportation companies are engaged in the business of serving the public in the same way, at the same time, and in the same busy place, and each is under the obligation of using due care toward the other. The operations of the express company are necessarily limited and guided by the arrival and departure of trains. The Rock Island empty train could not be loaded until it was brought into the depot and set for that purpose. The Chicago & Alton train could not be unloaded until it came in, and it was then the duty of the defendant to remove express matter as soon as trucks could be placed alongside of the express-car. This duty relates to trains which are delayed as well as to those which are on time. The express com-

pany finds its cars wherever the union depot regulations stop them, and in reaching those brought in by the Chicago & Alton it is necessarily compelled to infringe upon track 5. It is impossible to know the precise moment when an empty train will be backed in. It may be delayed by obstructions or may be kept waiting for signals an indefinite period at the various semaphores along its route, and it would be unreasonable to require the express company to suspend its work altogether and refrain from unloading a waiting Chicago & Alton train until a detained Rock Island "back-over," as it is called, could arrive and pass. All persons using the depot tracks under the orders of the depot company must be held to know when and how the work of the express company must be carried on, and to know that it must place its trucks in dangerous proximity to track 5 when unloading Chicago & Alton trains. Therefore, trucks stationed to receive express matter from those trains are rightfully employed, and the defendant was guilty of no breach of duty on account of the fact that it was in effect using track 5 when the Rock Island train approached.

The Rock Island train in question was made up in the company's yards from cars cleaned and prepared for travel, and was sent to the depot, there to be turned over to the conductor and to receive its burden of passengers, mail, and express. Not only was the public forbidden to use it while on the way to the depot, but it was accompanied by an escort who was charged with the special duty of keeping people off of it. The escort carried a key to enable him to go through the coaches, and had no business except to prevent persons from undertaking to ride. The conductor did not become responsible for the train until after it had backed into the depot and stopped there.

The only other person allowed upon the Rock Island coaches was a pilot, who was stationed upon the rear platform of the rear car for the purpose of guiding the train into the depot. He was provided with an air-

whistle with which to give warnings and an air-brake with which to stop the train. This brake worked with a small lever, applied to the entire length of the train the instant the lever was pressed down, and had the same power as the emergency brake. With it the pilot could stop the train as the engineer could stop it. The pilot's position was at the left-hand side of the platform, where the lever of the brake and the lever of the whistle were at his instant command. It was his duty to stop and hold the train for semaphore signals, to obey signals when received, to give signals to the engineer, to look out for pedestrians, vehicles, switching-engines and all kinds of obstructions, see that the train did not run into them, and, as occasion required, to use the whistle and the brake. His attention was entirely taken up with his duties.

When the messenger boy climbed upon the train he was perfectly familiar with the manner in which traffic in and about the union depot is conducted, even to minute details. He knew when and where to catch the train in question, knew it was empty, and was backing in to be turned over to the conductor, knew the pilot was not a conductor or brakeman, and knew he was busy attending to duties of the pilot, which no one else could discharge. He testified that he asked if he could ride and that the pilot said "Yes." By riding on the steps of the car he escaped the attention of the escort, who did not come outside the rear car door. A conflict between the boy's testimony and that of the pilot, who was a witness for the plaintiff, cannot, of course, be discussed.

When the train approached the depot both the pilot and the boy saw the cloud of steam and knew that it came from the engine of a Chicago & Alton passenger-train standing on track 6. This fact was of itself a warning, at least to the pilot, that the express company might have a truck in proximity to track 5 opposite the door of the express-car of the Chicago & Alton train. The pilot testified that he slowed down his train

because he feared there might be something on the other side of the steam. The boy testified that he knew they might run into something; that he had seen trains run into express trucks before; that he wanted to get off when he saw the steam; and that he would have done so if the platform had not been icy, and he without rubbers. Under these circumstances it is difficult to understand what function a watchman could have performed had he been present. Not only were the facts sufficient to give notice of the specific peril which was encountered, but an apprehension of danger actually existed in the minds of the very persons who were to be put on guard. Evidently what was needed at the critical moment was such control of his train by the Rock Island pilot that, if the truck and train collided at all, the car steps would not be stripped off by the impact, and the truck would not be carried along some twenty or twenty-five feet by the momentum of the car, as actually did occur.

Conceding, however, that the express company owed some duty in the premises, it is not apparent that it was under any obligation to the messenger boy, except to refrain from the wilful infliction of injury upon him. It is elementary law that there can be no liability for negligence, unless in consequence of the violation of some duty owed to the aggrieved party at the time and place the injury occurs.

"Culpable negligence on the part of one person as toward another always involves *a breach of duty* on the part of the former as toward the latter. Where there is *no breach of duty,* there can be no culpable negligence, and it is only for negligence of a culpable character that any person can be held responsible in law." (*Rush, Adm'x, v. Mo. Pac. Rly. Co.,* 36 Kan. 129, 135, 12 Pac. 582, 585.)

"The first requisite in establishing negligence is to show the existence of the duty which it is supposed has not been performed. A duty may be general, and owing to everybody, or it may be particular, and owing to a single person only, by reason of his peculiar position. An instance of the latter sort is the duty the

owner of land owes to furnish by it lateral support to the land of the adjoining owner. But a duty owing to everybody can never become the foundation of an action until some individual is placed in position which gives him particular occasion to insist upon its performance. It then becomes a duty to him personally. The general duty of a railway company to run its trains with care becomes a particular duty to no one until he is in position to have a right to complain of the neglect." (Cooley, Torts, 2d ed., 791.)

"Actionable negligence is the failure to discharge a legal duty to the person injured. If there is no duty, there is no negligence. Even if a defendant owes a duty to some one else, but does not owe it to the person injured, no action will lie. The duty must be due to the person injured. These principles are elementary, and are equally applicable whether the duty is imposed by positive statute or is founded on general common-law principles." (*Akers v. Chicago, St. P., M. & O. Ry. Co.,* 58 Minn. 540, 544, 60 N. W. 669, 670.)

"In order to justify a recovery, it is not sufficient to show that the defendant has neglected some duty or obligation existing at common law or imposed by statute, but that the defendant has neglected a duty or obligation which it owes to him who claims damages for the neglect. (*O'Donnell v. P. & W. R. R. Co.,* 6 R. I. 211.) It has been said: 'However great the defendant's negligence, if it was committed without violating any duty which he owed either directly to the plaintiff or to the public in a matter whereof he had the right to avail himself, . . . there is nothing which the law will redress.' (Bishop on Non-contract Law, § 446.) In Shearman & Redfield on Negligence (4th ed., § 8) the doctrine is thus expressed: 'If the defendant owes a duty, but does not owe it to the plaintiff, the action will not lie.'" (*Williams v. C. & A. R. R. Co.,* 135 Ill. 491, 496, 26 N. E. 661, 662, 11 L. R. A. 352, 25 Am. St. Rep. 397.)

"Negligence is an omission of care and caution in what we do. But the duty to be actively cautious and vigilant is relative, and, where that duty has no existence between particular parties, there can be no such thing as negligence in the legal sense of the term." (*Morris v. Brown et al.,* 111 N. Y. 318, 326, 18 N. E. 722, 724, 7 Am. St. Rep. 751.)

Besides this, duties are always dictated by the exigencies of some particular state of circumstances.

"If there be no negligence, though there be an injury, no action will lie. Negligence is essentially relative. In the abstract it is a nullity—it does not and it cannot, in the nature of things, exist. It is metaphysically impossible to evolve a concept of negligence apart from the facts which give rise to it and independently of some imposed or implied correlative duty. The duty must be essentially related to the particular circumstances, and a variance in the circumstances necessarily begets either a modification of the duty or else extinguishes it altogether. Thus the duty which a railroad company owes to a passenger whom it is carrying on its train is widely different from the duty it owes to a trespasser on its tracks; not only because the rights of the two are different, but because the attendant circumstances and facts creating the reciprocal rights, in each instance, are dissimilar. This difference in rights and in duties springs from a divergence in the circumstances out of which they respectively grow. Consequently a condition which would in one case give rise to an inference of negligence would be wholly insufficient to justify its deduction in the other." (*City Pass. Ry. Co. v. Nugent,* 86 Md. 349, 356, 38 Atl. 779, 781.)

And in every instance the duty of taking care presupposes knowledge, or its equivalent, of the particular state of facts out of which it arises. There must be prevision of danger and likelihood of injury, for the law imposes responsibility for that only which reasonable prudence can anticipate. Authorities in support of this proposition would be superfluous.

Conceding that, on account of the conduct of its pilot, the Rock Island company was bound to recognize the messenger boy as a licensee, he enjoyed no higher rights, so far as the defendant is concerned, than a trespasser upon that portion of the railway-track which the defendant was entitled to use. It made no difference that he came on the Rock Island train. His rights were not thereby magnified over what they would have been if he had used a car of his own. The

·circumstances afforded to the express company no admonition of his presence. The guilty knowledge of the pilot could not be imputed to the defendant. The train was not a train for licensees. Nobody had any right there, and nobody ought to have been there, but the trainmen. The defendant had no more reason to believe that a Western Union messenger would be riding upon the lower car steps than it had to expect that a packing-house workman would be there, and it cannot be required to expend its resources in employing watchmen to guard the safety of any one whose presence within the range of its activities is not to be anticipated.

It does not aid the plaintiff that the defendant knew the pilot would be upon the rear platform, and that the escort would be somewhere upon the train. That fact did not bring the telegraph company's servant within the range of the defendant's foresight. The pilot and the escort were trainmen charged with knowledge of all the union depot regulations, and of all the circumstances surrounding the use of the depot tracks. They had a full comprehension of all the dangers to be encountered there, of the right of the defendant to encroach upon track 5, and of all the means of averting such dangers and dealing with such encroachments. They were in command of an agency for sounding an alarm at their approach, and of an appliance for the instantaneous stopping of the train and averting of injury if their warnings were not observed; and to such persons the defendant owed a due measure of care.

If the train had been a passenger-train those properly upon it would have been within the purview of the defendant's obligation to protect. They would have been in charge of a conductor and a number of other servants skilled in the exercise of the highest vigilance to avoid imperiling them. The management of such a train is according to its own peculiar and appropriate methods, and to all persons entitled to ride

upon it the defendant owes a due measure of care. But the defendant, in the discharge of its important public duties respecting the secure and speedy transportation of property, is not bound to adjust its business to meet the sudden perils of intruders who impose themselves upon it without warning, who voluntarily place themselves in exposed positions where they are without the protection of others, and who are destitute of means for protecting themselves.

Cases like *Railway Co. v. Parry*, 67 Kan. 515, 73 Pac. 105, and *Combs v. Thompson*, 68 Kan. 277, 74 Pac. 1127, holding that anticipation of the specific injury which happens to result from a negligent act is not essential in order to charge a wrong-doer, have no application to the facts of this controversy. In each instance a duty to the injured person was established. In the Parry case the duty of the railway company to protect a sick passenger from the consequences of his delirium was involved, and this duty was violated, whether the man wandered away for several miles and was killed upon the defendant's tracks or whether his illness led him into other danger. In the Combs case the defendant amused himself by recklessly discharging a loaded cannon into a public street of a populous city, along which crowds of people were passing. Of course he was liable to the man he shot, although he did not single out that particular individual as a target. In the Parry case the duty was personal to the passenger. In the Combs case it was general to all who came within reach of the defendant's missiles.

. In this case the messenger had no personal claim upon the defendant's attention, and he belonged to no class to the individuals of which generally the defendant owed a duty. Therefore, the fundamental element of a cause of action in favor of the plaintiff is wanting. This conclusion follows from a consideration of the admissions of the injured party and the uncontradicted and unconflicting testimony of the plaintiff's own witnesses. However, since the facts are not found

or agreed to, in the sense of the statute permitting this court to order judgment, the cause must be remanded for a new trial, and to that end the judgment of the district court is reversed.

A preliminary jurisdictional question is decided in favor of the plaintiff.

All the Justices concurring.