## Louisville and Nashville Railroad Company v. Davis' Administratrix.

(Decided June 24, 1932.)

ASHBY M. WARREN, H. T. LIVELY, J. P. HAMILTON, S. D. ROUSE, and C. S. LANDRUM, for appellant.

HOFFMAN & BURKE, B. V. PATER, and BLAKELY & MURPHY, for appellee.

OPINION OF THE COURT BY JUDGE CLAY.—Reversing.

This is an appeal from a $20,000 judgment in favor of appellee.

It is conceded that at the time of the accident the railroad company was engaged, and Davis was employed, in interstate commerce, and that the Federal Employers' Liability Act (45 USCA secs. 51-59) is controlling.

The facts are these: Davis was head brakeman on a freight train running from Lexington to Maysville. Pursuant to instructions, the train stopped at Flemingsburg Junction to pick up a car of ties to be unloaded by the section men between that point and Marshall. When placed in the train, the tie car was the fourth car from the engine. As the train approached the point where the ties were to be unloaded, Davis rode on the lower stirrup on the east side of the north end of the car next behind the car containing the ties. On reaching the section men, who were to do the unloading, Davis dropped off and asked Markey, the section foreman, if he wanted the tie car to be cut from the train, but was told that this was not necessary. Six of the section hands took their places in the car and began the work of unloading. Markey, the foreman, was standing on the south end of the car where he could see what the people were doing. The sides of the car were so high that men in the car or on the ground could not see each other. Grover Lynn, one of the section men, was stationed on the ground to the rear of the tie car on the east side to see that the ties when unloaded did not roll back upon the track. After stat-

ing that the men inside the car were throwing out the ties on both sides, and that one layer of the ties had been thrown on the east side from the rear of the car, Lynn, the only witness as to how the accident occurred, testified as follows on direct examination:

"Q. Then what did Mr. Davis do? A. Just stood there by me.

"Q. That is at the south end of the car? A. Yes, sir.

"Q. The men were throwing the ties off the south end of the car? A. Yes, sir.

"Q. Did Mr. Davis start to do anything? A. No, sir.

"Q. At any time? A. He went up towards the engine.

"Q. How many ties had been thrown off the south end of the car before Mr. Davis started towards the engine? A. Well, on that side about five ties had been thrown off.

"Q. At that time, had the ties been thrown off any other part of the car on the east side? A. Throwed on the west side.

"Q. On the east side, had they thrown any ties off any other part of the car? A. No, sir.

"Q. Tell the jury what Mr. Davis did? A. Well, Mr. Davis was standing there by me, and he seen he had a chance to go to the engine, about the time he got where the second layer of ties was on this car, someone throwed one out on him.

"Q. What part of the car did they throw it out? A. Towards the engine, about the center of the car.

"Q. Was that the first tie that had been thrown off on that side? A. Yes, sir.

"Q. What did he do, before he started up towards the engine? A. When he started, he started to run.

"Q. I mean about the tie coming off, what did he do about that? A. He seen he had a chance, the way was clear for him then.

"Q. When did he start? A. After this tie had been thrown out.

"Q. Then did he start? A. Yes, sir.

"Q. Going fast or walking? A. He was running

"Q. When he got to the middle this tie hit him? A. Yes, sir.

"Q. He got past the point where the tie had been thrown off? A. Yes, sir, done got passed that point."

On cross-examination Lynn testified as follows:

"Q. You had removed yourself from any danger of the ties coming over there, but were in a position where you could see where they were thrown? A. Yes, sir.

"Q. Did you see up in that car at all where the ties were? A. Could I see up in there, no, sir.

"Q. At any time did you look in that car before it was unloaded? A. I remember watching them unload it.

"Q. Do you remember whether it was the same or not, the same car or not, you don't remember how the ties were placed in that car? A. No, sir, I don't.

"Q. Now, Mr. Lynn, while you stood there, they had thrown out, I believe you said, as many as five ties from the south end of that car? A. Yes, sir.

"Q. You don't know whether the car was full of ties or not? A. The next morning I was in the car the next morning.

"Q. You were in the car the next morning? A. Yes, sir.

"Q. Had all the ties been thrown out? A. No, sir.

"Q. How many tiers of ties were there? A. Two layers.

"Q. One in the rear and one next to it? A. Yes, sir.

"Q. The ties were laid in lengthwise and then at the end of this tier another tier began? A. Yes, sir.

"Q. So that the car was loaded really at the south end of it? A. Yes, sir.

"Q. Now, when did you first notice Mr. Davis, Mr. Oscar D. Davis? A. When he came up on the car.

"Q. Did he ride up on this car? A. Yes, sir.

"Q. And he was standing in the stirrups on the side of the car? A. Yes, sir.

"Q. Which was the first car back of the one that was loaded? A. Yes, sir.

"Q. Which stirrup was he standing on? A. On the bottom.

"Q. At which end? A. Towards the engine of that car.

Q. So he was in the stirrup on the end of the car which was next to the south end of the car where the ties were? A. Yes, sir.

"Q. What was his job in that crew? A. Brakeman.

"Q. The head brakeman? A. Well. I don't know whether he was the head brakeman or not.

"Q. Now, when he got off of that stirrup, where did he go? A. He never went no where, he stayed there by me.

"Q. You were standing right there at the point where he got off? A. Yes, sir.

"Q. He got off the side of the car, and came there and stood by you? A. Yes, sir.

"Q. Could you or he see up in the car where the men were unloading the ties? A. I couldn't, I don't know whether he could or not.

"Q. It stands to reason he could not see up in there, and so far as you know the men in the car couldn't see you down there? A. Not as I know of.

"Q. How long did he stand there by you? A. Well, he stood there long enough, been about five ties thrown out of the first layer.

"Q. From the point where you stood, could you see up as far as the engine? A. Yes, sir.

"Q. I believe you said there were about eight cars in the train? A. I believe, I ain't saying for sure.

"Q. Had the engineer and fireman gotten out of the cab? A. I seen some get out of the engine and sit on the bank, I don't know who it was.

"Q. Did Davis say anything to you while he was standing there? A. No, sir.

"Q. But he was watching these ties being thrown over? A. Yes, sir.

"Q. And after several ties had been thrown over, and then the last one that came over, immediately after that tie was thrown over, he

started to run past that car, did he? A. Yes, sir, but that tie had done hit the ground.

"Q. When that tie came over, then he started to run forward? A. Yes, sir.

"Q. And the next tie came over and struck him? A. Out of the second layer.

"Q. Mr. Lynn, are you positive, or didn't you notice whether any ties had been thrown over from any point other than this rear tier? A. That was the only place ties were coming out the right side was in the rear.

"Q. You think all the ties that came out before that time had been thrown from the southern tier of that car? A. All the ties coming out was in the rear of the car on that side.

"Q. Then the tie that struck him, was thrown out further towards the Maysville end of the car? A. Yes, sir, the first tie that had been thrown out of that layer."

There was further evidence that the duties of Davis, the head brakeman, were to open and close the switches for the purpose of passing other trains, cut the train for the purpose of picking up or setting off cars, and unloading freight at the station, and that his position was on or near the head end of the train, or wherever it was necessary for him to be to attend to what he had to do.

The principal ground on which a reversal is asked is that the court erred in refusing to sustain appellant's motion for a directed verdict. The basis of this contention is that no negligence was shown, that Davis assumed the risk, and that his contributory negligence was the sole cause of his injury. On the other hand, appellee insists that appellant was negligent in failing to warn Davis of its purpose to throw a tie from the middle of the car, and this was the theory on which the case was submitted to the jury. In support of this position appellee relies upon the case of Grainger & Co. v. Jeffries, 175 Ky. 716, 194 S. W. 905, where the facts were these: The roof of a building owned by the Louisville Varnish Company was destroyed by fire, and Grainger & Co. had been employed to take out and replace the iron rafters that had been bent by the heat. In doing the work the employees of Grainger & Co. would carry the rafters to the edge of the roof and drop them to the ground. By the side of the building there

was a passageway used by the employees of the varnish company in going through and about the premises in the performance of their duties. In going through this passageway Jeffries, an employee of the varnish company, was struck by an iron that had been dropped from the roof. Grainger & Co. had stationed one of its men named Cross in the passageway to warn employees of the varnish company when material was about to be thrown from the roof of the building. On the day the accident occurred Jeffries had been through the passageway, and on each occasion had awaited the signal from Cross indicating that the way was safe. On the occasion in question Cross was not at the place where he was accustomed to be, but was standing some distance away with his back to the building talking to another man. When Jeffries saw him in this position, he assumed that the place was safe, and started to walk through without a signal from Cross. When he had gone a few feet, he was struck by a rafter thrown from the roof. Thus it will be seen that Grainger & Co., though having undertaken the work of warning the employees of the varnish company, failed to do so, and it was held that, whether Jeffries was guilty of contributory negligence in attempting to pass the building while the guard was talking with some one else, and without waiting for the signal, was a question for the jury.

Another case relied on is New York, C. & St. L. R. Co. v. Slater (C. C. A.) 23 F. (2d) 777, 779. In that case Slater and other employees of the railroad company were moving certain stringers and loading them on a gondola car. The operation consisted of fastening to the stringers hooks which were connected with a cable attached to the arm of a derrick. After lifting five timbers, the sixth timber was handled differently. According to Moyer, the crane operator, who handled the derrick, the lifting of this timber was certain to result in its swinging in a partial circle south. When he picked the timber up he did not know whether Slater was in a safe position or not, but did know that he was out of view past the end of the car. The court said:

"Upon this evidence, we think a jury might have found that Moyer was not exercising ordinary care when he lifted this timber, without taking

greater precaution to learn whether those he could not see were in a place of safety.''

It is at once apparent that neither of these cases is in point. In the first case Grainger & Co. had undertaken the task of warning the employees of the varnish company, but failed to warn Jeffries. In the other case Slater himself was engaged in the work, and a change in the method of doing the work was extremely dangerous, unless precautions were taken to see that he was in a place of safety. In the case at bar neither Davis nor any other employee was stationed on the east side of the car from which the ties were being thrown, and none of the employees was passing along on that side of the car. On the contrary, Davis was standing to the rear of the car in a place of perfect safety. The foreman was looking into the tie car with his back to Davis. There was no change in the method of operation. The unloading of the ties. wherever they were was the business in hand, and the fact that the tie that struck Davis came from near the middle instead of near the end, where the five ties already thrown from the east side came from, is wholly immaterial. Davis neither said nor did anything indicating his purpose to pass. The foreman was not charged with the duty of anticipating that Davis, who was in a place of safety, would undertake to pass while the ties were being unloaded. Certainly there was no opportunity for warning after Davis attempted to run by the car. In the circumstances, the foreman was under no duty to warn Davis of a danger of which he was already apprised. Not only so, but in its final analysis the case comes to this: Though it was proper for Davis to go to the head of the train if he could do so without endangering his safety, there was no emergency calling him there at the time of the accident. He knew the ties were being unloaded, and saw five ties thrown from near the end of the car on the east side. The danger of passing while the ties were being thrown over was perfectly obvious to a person of common understanding. When the fifth tie landed, Davis assumed that he could run by before the next tie came over. In doing this he exposed himself to a known danger, and there can be no doubt, not only that he assumed the risk, but that his own recklessness was the sole cause of the injury that resulted in his

death. It follows that appellant's motion for a directed verdict should have been sustained.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.