# FORT WORTH & DENVER CITY RY. CO. v. ROGERS.
## No 2843.

Court of Civil Appeals of Texas. El Paso.
June 29, 1933.

Rehearing Denied July 19, 1933.

Thompson & Barwise, of Fort Worth, and J. M. Chambers, of Dallas, for appellant.

R. E. Kepke and Saner, Saner & Jack, all of Dallas, for appellee.

HIGGINS, Justice.

Mrs. Rogers brought this suit against appellant to recover damages for the alleged negligent killing of her son Rollo Rogers. She recovered judgment in the sum of $3,500, from which the defendant appeals.

The deceased was a member of appellant's bridge gang. He was an experienced man in that line of work having been so engaged for many years.

At the time he received the injury which caused his death the gang was engaged in unloading heavy stringers from a steel gondola car. A. S. Edwards was the foreman of the gang and in charge of the work being done.

The car was thirty-six feet long. The stringers were between twenty-seven and thirty feet long. The deceased was five feet six or seven inches high. Plaintiff's witness, Caviness, estimated that it was eight to ten feet from the ground to the top of the car. Edwards at one time said the car was practically four feet to the bottom from the ground and then from the bottom to the top four feet eight inches, and at another time he said the car was "about nine feet from the ground to the top of the body—about nine feet four inches I suppose somewhere along there."

In getting the stringers out of the bed of the car down to the ground where they were being laid two bridge ties ten feet long and eight by eight inches in size were leaned up against the northeast side of the bed of the car, a short distance back from each of the corners on that side, the upper ends of the ties resting against the side about two feet below the upper edge, so that a stringer, when pushed off the top of the side of the bed, had a drop of about two feet before striking the skids, down which it would slide to the ground. After the load of stringers was reduced so that they were some distance below the top of the bed, the men in the

car used short two by six-inch skids upon which to slide or roll the stringers up to the top of the bed, from where they were pushed off onto the ten-foot skids. In doing this work, the foreman, with five of the crew, were up in the bed of the car, the five of the crew rolling or pushing the stringers up out of the bed to the top edge of the side, from whence, when released, they would slide to the ground.

When a stringer was pushed to the top of the side, it would be released upon Edwards' order to "roll it." Rogers was on the ground. When a stringer was shoved over the side of the car and slid down the skids to the ground, Rogers, using a canthook, would slide it back against the other stringers then on the ground and line it up. He had no other service to perform and to do the same he would have about two minutes; in other words, a stringer was shoved over the side of the car about every two minutes. When Rogers performed such service, he had nothing to do except to repair to a place of safety and await the coming of another stringer. The evidence shows that when he had performed the operation stated, he would always repair to the north end of the car and remain there until another stringer was unloaded.

A stringer had been unloaded. Rogers slid it back and lined it up. He repaired to the north end of the car and was standing there. Another stringer was shoved over the top of the side of the car and, as it descended, it struck Rogers upon the side of the head inflicting the fatal injury. The south end of this stringer descended ahead of the north end. The evidence is not clear whether the south end struck the ground before the north end began to descend, but in any event the south end was very near the ground before the north end began to descend the skid. The south end when it struck the ground first necessarily caused the north end to descend in an arc to the north.

The facts stated above are undisputed.

Briefly stated plaintiff alleged negligence in the following particulars: (a) Failure to furnish a safe car; (b) failure to furnish an adequate crew; (c) failure to furnish adequate machinery; (d) failure of appellant's foreman to keep a lookout for Rogers; (e) failure of appellant's foreman to warn Rogers; (f) negligence of appellant's foreman in ordering stringer released before ascertaining that Rogers was in a safe position; (g) negligence of the crew in failing to keep a lookout for Rogers; (h) negligence of the crew in recklessly releasing the stringer without ascertaining that Rogers was in a place of safety.

The court submitted the following:

"Do you find from a preponderance of the evidence that A. S. Edwards was entrusted by the defendant with the control and command of Rollo Rogers and the other members of the defendant's bridge gang while said Rogers and the other members of said bridge gang were working for defendant?"

"Do you find from a preponderance of the evidence that A. S. Edwards failed to keep a proper lookout to discover the presence of Rollo Rogers in a place of danger, if you find that he was in a place of danger, at the time and immediately prior to the time Rollo Rogers was injured?"

"Do you find from a preponderance of the evidence that A. S. Edwards failed to warn Rollo Rogers that a stringer was being released immediately prior to the time that Rollo Rogers was injured?

"Do you find from a preponderance of the evidence that the defendant failed to provide a sufficient crew to perform the work of unloading and stacking the stringers in question at the time and place referred to in plaintiff's original petition?"

"Do you find from a preponderance of the evidence that the defendant failed to provide the bridge gang in question with adequate apparatus to assist in the unloading of the stringers at the time and place referred to in plaintiff's original petition?"

The first issue was answered, "Yes." The issues relating to a proper lookout and failure to warn were answered in plaintiff's favor. It was also found that the same constituted negligence proximately causing the injury and death of Rogers.

The other two issues were answered, "No."

The issue of unavoidable accident was also found in plaintiff's favor.

It was found that on the occasion in question Rogers did not fail "to use that degree of care for his own safety that a reasonably prudent person would have used under the same or similar circumstances."

No charge was made that the south end of the fatal stringer in going down the skids ahead of the north end was the result of negligence, nor was any such issue submitted or requested.

The foreman, Edwards, and the other five members of the crew in the car did not see the accident.

Plaintiff's witnesses, Caviness and Anglin, saw the accident and testified as to the manner in which it occurred. They were the only witnesses who undertook to testify how it happened.

Caviness operated a filling station about 100 yards distant. He testified that from the filling station he watched the men unloading the stringers; the men in the car would roll the stringers up the skids to the top or edge of the car and push them off and they would slide to the ground on the skids leaning against the side of the car. "I was looking

at the men doing this work at the particular time that Mr. Rogers was struck. Mr. Rogers was hit on the side of the head by the end of the stringer. It looked to me like it hit him right on the top of his head. * * * When I saw him one time just before he was struck, he was standing at the end of the car. * * * Just before Mr. Rogers was struck he was standing at the end of the car."

At the time of the accident Anglin was about 60 yards away. He testified:

"At the time this stringer hit him he was standing at the north end of the car. * * * He was standing there at the north end of the car, or at the corner of the car, towards the road. * * * I do not remember which way Mr. Rogers was facing at the time he was struck, but he was on the northeast corner of the car, I believe he was facing that corner over there. At the time he was struck he had his elbow leaning up against the car, or at the end of the car. Mr. Rogers was hit by one of those stringers somewhere about the head. The bridge crew rolled that stringer off of the car. At the time Mr. Rogers was struck by this stringer I had been observing him there for several minutes. * * *

"When Mr. Rogers would take his canthook and place the stringer in position after it rolled off of the car he would again come back to the end of the car, and that would put him out of the way of the stringer. At the particular time that he was struck he was leaning up against the car with his elbow against the car, or his shoulder against the car; in other words, he was just leaning up against the end of the car. I never noticed which way he was facing when he was leaning up against the end of the car. At the time he was struck he was right up at the corner of the car. * * * I was not looking right at him the instant he was struck; was not think anything about it. * * * At the time Mr. Rogers was struck he was leaning up against the end of the car, and at that time his right side was next to the car; his right side was against the end or corner of the car. * * * I think that he was leaning up against the end of the bed of the car. * * * From the time they pushed the stringer off of the side of the car until it struck Mr. Rogers, he had not moved; he was still standing there leaning against the car."

The undisputed testimony shows that Rogers had nothing to do with unloading the stringers from the car to the ground; that his task, after the stringers reached the ground, was to roll them back out of the way with the canthook and line them up. When he had done that, he had nothing to do except to repair to a place of safety and await the descent of another stringer.

The testimony all shows that Rogers had

rolled back and lined up the stringer which preceded the fatal one and had gone back to a point at or near the north end of the car.

Edwards testified he was in the car at the south end.

"After we got the stringer up to the top of the car, and just before we rolled it off onto the ground I stepped, or I walked around the end of the stringer and looked over the side of the car to see where Mr. Rogers was at. So, not seeing Mr. Rogers from the position I was in, I presumed he was in the clear, which he was at that time. If he had not been in the clear I could have seen him. If he had been anywhere along the side of the car that we were unloading, or between the side of the car and a falling stringer, there would not have been anything to have obstructed my view of him; I believe I could have seen him, but I did not see him. I believe I could have seen him if he had been anywhere along the side of the car, or between the side of the car and the pile of stringers that we were piling up there. When he left the pile of stringers to get out of the way for the next stringer that would be thrown off of the car, he would go to the northwest end of the car. When he went, or would be around the end of the car, after he got through placing the stringer after it hit the ground, I could not see him from my side of the car."

The witness Knott was one of the men working in the car and testified for the defendant. He was working in the car ten to fifteen feet from its north end. He testified that after a stringer was rolled up to the top of the car he would always look over the stringer and side of the car and upon the occasion in question he looked over the side and did not see anybody. "There was nothing that would obstruct my view of anybody if they had been standing along the side of the car, between where I looked and the north end of the car. I could have seen an object that was as big as anybody; that is, a man or anything of that kind. * * * At the time the stringer got up to the top of the skids on the car, just before we rolled it off on to the skids on to the ground, it was eight inches above the top of the car. Those stringers are sixteen inches wide. I looked over that eight inches or sixteen inches down on the ground by the side of the car. When I looked over the side of the car I was about ten or twelve feet from the north end of the car."

Other members of the crew testified, but their testimony is of no importance in the determination of the question at issue.

Whether Edwards looked for Rogers as he said he did is an issue raised by the testimony of Anglin, as follows:

"From Mr. Rogers' position on the ground, I believe that he would have been seen by

the men on the inside of the car if they had been looking.

"I do not believe that there was anything in the way to obstruct the view of the boss in the car, to prevent the boss from seeing the man on the ground. * * *

"I think that the side of the car projected higher than Mr. Rogers' head when he was standing up there by the side of the car. I do not know how much higher it was; I did not notice. I think that it was above his head. In other words, when he was standing there at the corner of the car his head was not as high as the top of the car. I have already stated that there was nothing there to prevent the foreman from seeing Mr. Rogers as he stood there by or at the end of the car so far as I know. If a man was standing at the end of the car and his head was not as high as the top of the body of the car, and he was standing there leaning against the end of the car, his head would not be where it would project above the top of the car. It is true that the foreman standing leaning against the south end of the car, and this man leaning against the north end of the car, the one inside of the car could not see a man standing there."

The testimony of Caviness and Anglin does not show with certainty the exact position of Rogers at the time he was struck. They definitely place him at the north end of the car, but they leave it uncertain whether he was around the corner from the side of the car, or on the side near the north end. Anglin states definitely that "from the time they pushed the stringer off of the side of the car until it struck Mr. Rogers he had not moved; he was still standing there leaning against the car." The nearest Anglin came to definitely fixing the position of Rogers as by the side of the car rather than around the corner at the end is when he testified, "I think that the side of the car projected higher than Mr. Rogers' head when he was standing up there by the side of the car."

If Rogers had not moved and was standing leaning against the car at the time he was struck, he was necessarily by the side of the car, for it would have been a physical impossibility for him to have been struck if he was standing at the end and around the corner.

It must be assumed, according to the testimony, that Rogers, at the time he was struck, was standing near the north end of the car and leaning against its side. Such position was obviously one of danger from the next descending stringer.

The question thus arises whether actionable negligence is shown by the failure of Edwards to maintain such a lookout as would have discovered Rogers in such position.

We are of the opinion this question should be answered in the negative.

■ Foreseeableness, or a reasonable anticipation of the consequences, is a necessary element to be considered in determining whether a particular act or omission constitutes negligence and also in determining whether an injury is proximately caused by such act or omission. Texas & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; City of Dallas v. Máxwell (Tex. Com. App.) 248 S. W. 667; 27 A. L. R. 927.

"To constitute actionable negligence there must be not only a lack of care, but such lack of care must involve a breach of some duty owed to a person who is injured in consequence of such breach." 45 C. J., title Negligence, §§ 2 and 16.

"In order to constitute actionable negligence there must exist three essential elements—namely, a duty or obligation which the defendant is under to protect the plaintiff from injury; a failure to discharge that duty; and injury resulting from that failure." 20 R. C. L., title Negligence, § 7; Pullman Co. v. Caviness, 53 Tex. Civ. App. 540, 116 S. W. 410; Galveston, H. & S. A. R. Co. v. Brown, 95 Tex. 2, 63 S. W. 305.

■ To a servant, who in the discharge of his duty is required to go and does go into a position of danger where his safety would be imperiled by any sudden change in his environment, the master owes the duty of exercising ordinary care for the protection of the safety of such servant.

This principle finds frequent application in the case of railway employees whose duties require them to go into places where their safety would be imperiled by the movement of trains or cars.

■ On the other hand, the master, of course, is not an insurer of the servant's safety. He is not liable for the results of a mere accident. Ebersole v. Sapp (Tex. Com. App.) 208 S. W. 156.

In Labatt on Master and Servant (1st Ed.) under the chapter relating to knowledge as an element of liability at section 147, says: "Unexpected position of the servant at the time of the accident.—In a third group the rationale of the inability to maintain the action was that the local relations of the injured person with respect to the appliance in question at the time of the accident were such as for some reason the master was not bound to anticipate. These cases, it will be observed, merge into those in which contributory negligence is ascribed to a servant who puts himself unnecessarily in a dangerous position."

Under other chapters it said:

At section 209a: "Limits of this duty.— Both upon principle and authority it is clear that a master cannot be deemed culpable on the ground of an omission to give warning, where the servant already possesses suffi-

cient knowledge of the conditions to enable him to take appropriate precautions for safeguarding himself. Accordingly, a master 'is not required to keep special watch over his employee and warn him of common dangers to which he may be subjected in the performance of his ordinary duties.' "

At section 236: "No right of action is established where, taking into consideration the nature of the work assigned to the servant, the master had no reason to expect the contingency of the servant's placing himself in such a position as to incur the danger with regard to which it is alleged that he should have been instructed."

At section 337: "Going into or remaining in an unauthorized position.—In a later chapter (XXXIII) we shall have occasion to consider the rule that a servant who is injured while in a place where his duties do not require him to be cannot recover for the reason that the obligations of the master do not follow him into such a place or inure to his benefit while he is in it. Under the circumstances presented in some cases of this type, his inability to recover may also be referred to the conception that, in going into the place in question, he was guilty of contributory negligence. An additional ground for declaring his action not to be maintainable is shown where it appears that, while in such a place, he conducted himself in an imprudent manner. Evidence to this effect obviously suggests a breach of the duty discussed in § 331, supra.

"The boundary line between cases in which the position of the servant was merely one which he was not authorized to occupy, and cases in which that position was one which he had been expressly forbidden to occupy, is not easy to define. But the distinction is seldom, if ever, of any practical importance, the servant having no right of action in either event unless some qualifying factor is introduced by the evidence."

At section 626: "b. Circumstances under which recovery has been denied.—In a Scotch case it is intimated that the mere fact of the plaintiff's being out of his proper place at the time of the accident, contrary to the rules of work, does not prevent his recovering for injuries caused by defective machinery. This may possibly be the correct doctrine applicable to cases in which the defense of contributory negligence is relied upon. (See subsec. c. infra.) But if the statement is intended to define the extent of the employer's obligations, it embodies a theory which is opposed to the general current of authority, which is in favor of the principle that 'a master's duty in respect to furnishing his servants a safe place in which to work extends to such parts of his premises only as he has prepared for their occupancy while doing his work, and to such other parts as he knows or ought to

know they are accustomed to use while doing it.' The application of this principle has frequently prevented recovery in cases where the injury proximately resulted from the fact that the injured servant was occupying the dangerous position merely for his own convenience and accommodation. Under such circumstances his legal rights are no greater than those of a licensee. The same principle is equally applicable where the injured servant was actually engaged in the performance of his duties."

See, also, 39 C. J., title Master and Servant, §§ 574, 575.

█ █ In the performance of the task assigned to him it was necessary for Rogers, when a stringer slid to the ground, to go in front of the side of the car, roll the stringer back, and line it. While thus engaged, he would be in a position of danger if another stringer should be shoved off the car.

It was the duty of Edwards to exercise ordinary care not to injure Rogers while in that position. This necessarily required that, before ordering another stringer rolled off the car, Edwards should look and ascertain whether Rogers had rolled back and lined up the preceding stringer and retired from the only proper danger zone in front of the car. Pecos & N. T. R. Co. v. Suitor, 110 Tex. 250, 218 S. W. 1034; Missouri, K. & T. R. Co. v. Goss, 31 Tex. Civ. App. 300, 72 S. W. 94, 95; Kansas City, M. & O. R. Co. v. Estes (Tex. Civ. App.) 203 S. W. 1155; Id. (Tex. Com. App.) 228 S. W. 1087, 1089; Galveston, H. & S. A. R. Co. v. Andrews (Tex. Civ. App.) 291 S. W. 590; Murray v. Houston, etc., Co. (Tex. Com. App.) 222 S. W. 219.

After he had performed the task indicated, Rogers had nothing to do except to retire from the danger zone in front of the car and there await the descent of the next stringer.

The stringers had a clear drop of about two feet from the top of the car before they struck the skid. A position beside the car near its north end, where the evidence of Anglin necessarily placed Rogers, was obviously one of great danger. For Rogers to assume such position was wholly unnecessary, unauthorized, and inexcusable. Edwards could not have reasonably anticipated that Rogers would ever be in such position. Therefore, as we view it, Edwards owed Rogers no duty to maintain such a lookout as would have discovered his presence there.

Upon the peculiar facts of this case the failure of Edwards to discover Rogers in the particular place of danger the latter was in does not show actionable negligence. The essential element of anticipation of consequences was lacking.

We have found no case which is directly in point upon the facts. Somewhat in point is Louisville & N. R. Co. v. Davis' Adm'x, 245

Ky. 79, 51 S.W.(2d) 942, 944. In that case Davis, a train employee, was killed by a cross-tie thrown from a car by other employees engaged in unloading the ties from such car. In that case it was said:

"The principal ground on which a reversal is asked is that the court erred in refusing to sustain appellant's motion for a directed verdict. The basis of this contention is that no negligence was shown, that Davis assumed the risk, and that his contributory negligence was the sole cause of his injury. On the other hand, appellee insists that appellant was negligent in failing to warn Davis of its purpose to throw a tie from the middle of the car, and this was the theory on which the case was submitted to the jury. * * *

"In the case at bar neither Davis nor any other employee was stationed on the east side of the car from which the ties were being thrown, and none of the employees was passing along on that side of the car. On the contrary, Davis was standing to the rear of the car in a place of perfect safety. The foreman was looking into the tie car with his back to Davis. There was no change in the method of operation. The unloading of the ties wherever they were was the business in hand, and the fact that the tie that struck Davis came from near the middle instead of near the end, where the five ties already thrown from the east side came from, is wholly immaterial. Davis neither said nor did anything indicating his purpose to pass. The foreman was not charged with the duty of anticipating that Davis, who was in a place of safety, would undertake to pass while the ties were being unloaded. Certainly there was no opportunity for warning after Davis attempted to run by the car. In the circumstances, the foreman was under no duty to warn Davis of a danger of which he was already apprised. Not only so, but in its final analysis the case comes to this: Though it was proper for Davis to go to the head of the train if he could do so without endangering his safety, there was no emergency calling him there at the time of the accident. He knew the ties were being unloaded, and saw five ties thrown from near the end of the car on the east side. The danger of passing while the ties were being thrown over was perfectly obvious to a person of common understanding. When the fifth tie landed, Davis assumed that he could run by before the next tie came over. In doing this he exposed himself to a known danger, and there can be no doubt, not only that he assumed the risk, but that his own recklessness was the sole cause of the injury that resulted in his death."

Carey v. Chicago, etc., R. Co., 84 Kan. 274, 114 P. 197, 46 L. R. A. (N. S.) 877, is also somewhat in point.

In that case a number of workmen were employed in uncovering rock in a quarry operated by a railroad company, their duties not involving loading or handling the cars. Several loaded cars awaiting removal were standing upon a spur track near where they were at work. On account of a rain all but one of them entered the cars; he took shelter beneath a car and was run over and killed when a freight train backed into the cars in the process of picking them up. His widow recovered a judgment, the jury finding that the railroad company was negligent in failing to give proper warning of the approach of the train. It was held the defendant owed no duty to the deceased to give such a warning, and that his own conduct constituted negligence as a matter of law.

In the opinion it was said: "A special finding stated that the negligence of the defendant consisted in not giving a proper warning signal. We conclude that the plaintiff cannot recover, because the evidence and findings do not disclose any actionable negligence of the defendant, but, on the other hand, do establish that the accident resulted from the want of ordinary care on the part of the deceased. In the absence of a statute a railway company is not required to give warning of the approach of a train, except where it has reason to anticipate that persons will be upon the track. 33 Cyc., 782. Here the trainmen owed no such duty to Carey, inasmuch as they did not know of his presence, and had no reason to suppose that any person would be under the cars. Liability for negligence can result only from the violation of a duty owed to the person injured. See United States Exp. Co. v. Everest, 72 Kan. 517, 522, 83 P. 817, and cases there cited." See, also, Rittenhouse v. R. Co., 299 Mo. 199, 252 S. W. 945; Ring v. Ry. Co., 112 Mo. 220, 20 S. W. 436; Flannery v. New York, O. & W. R. Co. (C. C. A.) 29 F.(2d) 18; Cunningham v. R. Co., 249 Pa. 134, 94 A. 467.

None of the cases cited by appellee apply to the present facts.

Subsequent to submission of the case appellee cites Sullivan v. R. Co., 321 Mo. 697, 12 S.W.(2d) 735, and New York, C. & St. L. R. Co. v. Slater (C. C. A.) 23 F.(2d) 777.

In the Sullivan Case the employee was injured by a tie thrown from a car.

In the Slater Case the deceased and other employees were removing certain stringers and loading them on a gondola car.

The distinguishing feature of each of these cases is that the injured employee at the time he was injured was in a position of danger where in the discharge of his duty he was required to be.

In the case at bar Rogers had retired from the only place of danger his duty required him to be and had gone into another place of

danger where there was no occasion for him to go and where the foreman, Edwards, could not reasonably have anticipated he would be.

What has been said with reference to the matter of a proper lookout and the authorities cited above, apply also to the finding that Edwards failed to warn Rogers a stringer was being released. We think, under the circumstances, there was plainly no proximate causal relation between the failure to warn and the injury.

In Houston & T. C. R. Co. v. Nixon, 52 Tex. 19, the action was to recover damages for the death of a child struck by a train. It seems one ground of negligence charged against defendant was a failure to ring the bell as required by law. A charge was asked advising the jury that it made no difference whether the bell rang or not. Concerning that matter the court says: "Again, if the child had notice otherwise of the approach of the train, as the testimony would seem to indicate, then it was immaterial whether the bell rang or not, as the object which was intended to have been accomplished thereby had already been attained, and, under the testimony, this view of the case should have been presented to the jury."

Lancaster v. Browder (Tex. Civ. App.) 243 S. W. 625, 627, Id. (Tex. Com. App.) 256 S. W. 905, was a crossing accident. The court held that since the deceased saw the headlights of the train and knew of its approach when she went upon the crossing, the negligence in failing to sound the whistle or ring the bell was not the proximate cause of her death, and cite the Nixon Case as authority for the holding. A recovery by plaintiffs was had upon another ground of negligence, and the affirmance of the judgment was approved by the Supreme Court, but the correctness of the proposition as to proximate cause was not questioned.

In that case the court said: "We think it conclusively appears from the uncontroverted facts and testimony already recited that Mrs. Browder saw the headlight and knew of the approach of the train before and at the time she went upon the crossing. That being true, it follows conclusively that neither the negligence of the defendants found by the jury in failing to sound the whistle nor the negligence in failing to ring the bell could be held to be the proximate cause of Mrs. Browder's death, since the only purpose that could have been accomplished by giving such signals would be to warn pedestrians of the approach of the train, a fact which Mrs. Browder knew independent of such signals. Houston & T. C. R. Co. v. Nixon, 52 Tex. 19."

So in the case at bar, Rogers was waiting for the release of another stringer; he knew that at any moment it might descend. He knew perfectly well, without warning, what was going to happen and the failure of Edwards to give such warning could not be properly held to be the proximate cause of the injury.

We, therefore, sustain appellant's propositions which in different form question the sufficiency of the evidence to show actionable negligence on the part of the foreman, Edwards, in failing to maintain a proper lookout and in failing to give warning that the stringer was about to be released.

The assignment complaining of the refusal of a peremptory instruction in favor of the defendant is also sustained.

The court submitted the issues of failure to provide a sufficient crew and adequate apparatus. These issues were properly found in favor of the defendant because the evidence raised no such issues, and, if the same had been raised, it is manifest there was no causal connection between such failure and the injury to Rogers.

As to the other unsubmitted allegations of negligence, the evidence is either insufficient to raise the same or the causal connection is not shown.

But we will not reverse and render the cause for in our opinion the testimony of Caviness and Anglin has not been fully developed. They were eyewitnesses to the accident and the only ones. Their testimony leaves it uncertain whether Rogers went to the end of the car and around the corner or assumed a position near the end and against the side of the car. Upon a careful consideration of their testimony it seems to us that the obscurity in the testimony of Anglin and Caviness can be cleared and the circumstances under which the injury was sustained shown much more definitely than is reflected by the present record.

In view of retrial we will briefly state our conclusions upon other questions presented.

■ Exception was taken to the failure of the court to define what a proper lookout would be. This objection was well taken. Northern, etc., Co. v. Jenkins (Tex. Civ. App.) 266 S. W. 175; Robertson & Mueller v. Holden (Tex. Com. App.) 1 S.W.(2d) 570.

■ The reasonable cost of the funeral expenses of the deceased paid by appellee is recoverable. Smith v. Farrington, 117 Tex. 459, 6 S.W.(2d) 736; Humble, etc., Co. v. Ooley (Tex. Civ. App.) 46 S.W.(2d) 1038; Gulf, C. & S. F. Railway Co. v. Southwick (Tex. Civ. App.) 30 S. W. 592.

Reversed and remanded.