## Westinghouse Electric & Mfg. Co. v. Deakins.

June 20, 1947.

Rehearing denied October 14, 1947.

William H. Field, Judge.

Doolan, Helm, Stites & Wood for appellant.

Charles Leibson and Woodward, Dawson, Hobson & Fulton for appellee.

OPINION OF THE COURT BY JUDGE LATIMER—Reversing.

Appellee, Rebecca Deakins, instituted this action against appellant, Westinghouse Electric and Manufacturing Company, wherein she sought damages on account of disfigurement of her face due to the negligence of appellant. Upon trial she obtained judgment in the sum of $7,094.40.

Appellant is here seeking reversal of that judgment on the following grounds: (1) The court erred in failing to sustain defendant's motion for a peremptory instruction in its favor at the end of the plaintiff's evidence, and again at the conclusion of all the evidence, because (a) the plaintiff failed to prove any violation on the part of the defendant of any duty it owed to her, and (b) the uncontradicted evidence showed that the plaintiff had assumed any risk there may have been incident to her employment, and (c) plaintiff's injuries resulted from a chronic acne infection and not from any negligence on the part of Westinghouse. (2) The damages are so excessive as to indicate that they were given under the influence of passion and prejudice.

The appellant company, at the request of the Navy, was operating during the war a plant erected by the U. S. Navy for the production of Naval Ordnance. The particular building in which the appellee worked was a one-story building about 600 by 250 feet. Tracer shells were being produced in this building. These shells were small cylinders about three inches long and one inch in diameter which had been milled and threaded so as to fit in projectors. In order to remove oil and steel particles adhering to these shells, when they came out of the final process they were sprayed with Mineral Seal, a substance somewhat similar to kerosene. For the purpose of drying them off, air under pressure was then sprayed upon them. This operation, however, did not entirely dry them, and there was left a slight film of Mineral Seal upon them. The shells were then placed upon a conveyor and as they moved along this conveyor line they were inspected and measured to ascertain whether or not they met the necessary specifications. This inspection work required that each shell be placed in measuring devices. This work was performed by girls. The appellee was so employed.

Appellee's home is in Chattanooga, Tennessee,

where, prior to her employment with appellant company, she was a beauty operator. It appears that appellee's sister had been previously employed by appellant and had worked in the plant at the same type of work for about 6 weeks before appellee was employed. Appellee went to work for Westinghouse on August 14, 1944. She was assigned to a night shift. During the course of the first night she noticed an itching and burning sensation on her face. On the second night bumps began to appear, and three or four nights later her face was broken out all over. She consulted the company nurse and was given some salve to use on her face. After about a week her face condition becoming more aggravated, she consulted a skin specialist. What this skin specialist advised her is not shown by this record since he was not produced at the trial. However, appellee continued to work until September 3, 1944, at which time she quit and returned to her home at Chattanooga.

Because of their interrelation, a, b, and c under the first ground will be considered together. Appellant takes the position that appellee's injury resulted from a chronic acne infection and not from any negligence on the part of the company. In March 1943, long prior to the time she sought employment at Westinghouse, she consulted Dr. Shaw, a skin specialist in Chattanooga, Tennessee. In fact appellee stated that she had consulted another skin specialist prior to that time but was unable to recall his name at the time of the trial. The record discloses that she was under treatment with Dr. Shaw some two or three months following her consultation with him in March 1943. In his testimony Dr. Shaw stated that her condition was not a true acne condition but was worse than that, and that she was suffering with what he called pyodermafaciale, which left some scars on her face, which were there at the time she went to work for Westinghouse. Testimony was given pro and con by the doctors as to the effect of oil on this pre-existing skin condition. Some said it might aggravate it or cause a recurrence of eruptions on her face. Others said it would not. Some of the witnesses who testified stated that at the time she went to work she had an eruption on her face. Others denied this. Most of the witnesses agree that there was a presence of scars on

the face of appellee at the time she went to work. Just how and when Westinghouse first learned of this pre-existing condition, and of her prior treatment by skin specialists, is not known. But we cannot escape the fact that appellee knew it at the time she sought employment. She states that during the first night she noticed an itching and burning sensation on her face and that a short while, perhaps 30 minutes, before the close of working hours she consulted Mrs. Hardesty, a supervisor, and asked this supervisor if this oil would injure her face. She stated that she had a sensitive skin, and she said further that she had noticed other girls with breaking out on their hands and possibly on some faces. Doubtless, this, coupled with the knowledge of her pre-existing condition and her sensitive skin, prompted her to make this inquiry. She states that this supervisor told her that a number of them had this breaking out but it was not serious and that she didn't think the oil would be injurious.

Appellee takes the position that the appellant violated its duty to the plaintiff not only by failing to warn her of the danger, but by positively assuring her that there was no danger. Appellant counters with the argument that it violated no duty which it owed the plaintiff; that it was obligated only to exercise ordinary care to provide a reasonably safe place in which to work, and reasonably safe instrumentalities with which to work. If the work to which appellee was assigned was dangerous and there were hidden dangers, or such as would not be obvious to her, certainly Westinghouse owed her the duty of warning her of that danger. There were many employees doing this particular type of work. Some of them suffered some sort of reaction from working with these tracer shells with the presence of this "Mineral Seal". Some of them had a breaking out, or rash, which, upon application of salve, hand lotion, or cream, promptly cleared up and none of them became serious or permanent. There is no evidence here that this Mineral Seal was inherently dangerous. Based upon the knowledge of what had and was happening to others, Westinghouse, at most, could only warn her that in doing the type of work she was assigned to do she might experience a rash or breaking out on parts of her body coming in contact with this Mineral Seal. According

to her own testimony she knew this because her sister, who preceded her in employment there, had advised her and had experienced the same thing. She stated that she had observed that other girls working there had similar trouble. Certainly, it could not be reasonably assumed that Westinghouse had the duty to warn her of dangers which were obvious, or concerning something which she already knew. In Interstate Coal Company v. Deaton, 148 Ky. 160, 146 S. W. 396, 398, we said: "It is never necessary to warn a servant of a danger which he knows and appreciates." But we must go a step further here because the appellee's knowledge of the facts were more comprehensive than the knowledge of Westinghouse. Certainly they cannot be charged at the time of her employment with the knowledge of her having been treated by a skin specialist more than a year prior to her employment here. This was the knowledge that the appellee possessed. This, no doubt, was the basis for her statement that she had a sensitive skin. With this superior knowledge, after having observed the effect on other employees working at this type of work, she must necessarily assume the risk of any injury which may arise as a result of danger when she continues to work after knowledge of the existence of that danger.

It is peculiarly significant that after appellee had worked for several days she consulted Dr. Kelly, a well-known skin specialist in Louisville. What Dr. Kelly advised her does not appear in this record since he was not produced as a witness at the trial. But the significant part is that after she consulted him, whatever he may have told her, she continued to work. It is insisted by appellant that it is reasonable to conclude that Dr. Kelly told her one of two things—either that her work was injurious or that he did not regard the work as dangerous. If he advised her that doing that type of work was injurious and dangerous, and she continued, then she most certainly assumed the risk of the injury, or if the second—this skin specialist told her that it was not injurious—then it would be difficult to impose upon the appellant knowledge that the oil was inherently injurious and dangerous when a skin specialist did not regard it so.

We have here an employee with knowledge of a

pre-existing condition and trouble with her face, having been attended by a physician and undergone a series of treatments with him; with a knowledge of the existence of certain dangers incident to her work, as obtained from her sister, and from having seen the irritated skin on the faces and arms of other employees, and finally, after having consulted a doctor concerning her condition, she continued her work. It appears to us that this easily falls within the rule as laid down in Bell, Adm'x, v. Louisville & N. R. Co., 216 Ky. 42, 287 S. W. 219, and Louisville & N. R. Co. v. Davis' Adm'x, 245 Ky. 79, 51 S. W. 2d 942, that where an employee seeks and obtains employment with knowledge of the existence of certain dangers incident to the work, or continues working after becoming aware of the existence of such dangers, he assumes the risk of any injury which may arise as a result of such danger.

The Westinghouse plant, according to the record, was of the most modern type and the methods of work were those followed in industries generally of this kind. It certainly cannot be charged that Westinghouse was in any way responsible for the attack of acne which she suffered in 1943, more than a year prior to her employment with Westinghouse. There have been repeated recurrences of this malady, and according to the testimony of the doctors, there may be continued recurrences. The historical facts of this case demonstrate conclusively that appellee's employment was not responsible for the attack or recurrence of acne, even though it might have aggravated the condition.

We conclude, therefore, that the defendant violated no duty which it owed to the plaintiff, and while there might have been a recurrence of the malady, aggravated by the dangers of the work, the knowledge of her sensitive skin and pre-existing condition, coupled with her knowledge of the effect on the skin of other employees, places the responsibility upon her and not upon the Westinghouse Company. The defendant's motion for a peremptory instruction should have been sustained.

Thus concluding, it is unnecessary to discuss the matter of excessiveness of damages.

The judgment is reversed.