No. 65,083

KANSAS STATE BANK AND TRUST COMPANY, *Appellee*, v. SPECIAL-
IZED TRANSPORTATION SERVICES, INC., and UNIFIED SCHOOL
DISTRICT NO. 259, *Appellants*, and H. ARDON DAVIDSON,
*Defendant*.

(819 P.2d 587)

Opinion filed October 25, 1991.

*John E. Cowles*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause and was on the briefs for appellants.

*Steven R. Smith*, of Render, Kamas & Hammond, of Wichita, argued the cause, and *Albert L. Kamas*, of the same firm, was on the brief for appellee.

*Michelle V. Hostetler*, of Wichita, was on the brief for *amicus curiae* Kansas Child Abuse Prevention Council.

*Donald W. Vasos*, of Vasos, Kugler & Dickerson, of Kansas City, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

*Bruce Keplinger*, of Payne & Jones, Chartered, of Overland Park, was on the brief for *amicus curiae* Kansas Association of Defense Counsel.

*Cynthia Lutz Kelly* and *Kerry M. Gasper*, of Topeka, were on the brief for *amicus curiae* Kansas Association of School Boards.

The opinion of the court was delivered by

SIX, J.: This is a tort action arising out of the alleged sexual molestation of H.R. by her school bus driver, H. Ardon Davidson. H.R. is a six-year-old girl afflicted with Down's syndrome.

The case presents issues involving: (1) the sufficiency of the evidence to prove that the school district and Davidson's employer knew or should have known that an undue risk of harm would exist because of Davidson's employment; (2) school district immunity and the discretionary function exception under K.S.A. 75-6104(e) of the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*; (3) existence of a private right of action under the mandatory child abuse reporting statute, K.S.A. 1990 Supp. 38-1522; (4) apportionment of fault of negligent tortfeasors with the fault of an intentional tortfeasor; (5) the application of the KTCA K.S.A. 75-6105 $500,000 maximum liability provision; and (6) the amount of the damage verdict.

Our jurisdiction is under K.S.A. 20-3017 (transfer from the Court of Appeals to this court by motion).

The action is being prosecuted in the name of Kansas State Bank & Trust Company (Kansas State Bank), as conservator and next friend of H.R., a minor.

## The Trial Court Rulings

Plaintiff filed suit against Davidson for intentional battery and against Unified School District No. 259 (U.S.D.) and Specialized Transportation Services, Inc., (S.T.S.) on theories of respondeat superior, negligent hiring, and negligent retention and supervision of Davidson.

U.S.D. cross-claimed against S.T.S. asserting, in part, that S.T.S. had agreed to indemnify U.S.D. for any claims arising out of or in connection with the U.S.D.-S.T.S. transportation contract. Judgment was entered for U.S.D. against S.T.S. on the indemnification agreement cross-claim.

U.S.D. and S.T.S. were granted summary judgment on the respondeat superior and negligent hiring claims. The trial court

held that the intentional criminal act of Davidson was outside the scope of his employment and the uncontroverted facts show that Davidson was otherwise a competent and qualified person suitable for employment as a school bus driver. Summary judgment for U.S.D. was denied as to negligent retention and supervision of Davidson (genuine issues of material fact existed). The trial court further ruled U.S.D. was not immune from liability under the Kansas Tort Claims Act (KTCA) because the actions alleged by plaintiff to be wrongful were not discretionary functions.

After the plaintiff rested its case, U.S.D. and S.T.S. moved for a directed verdict, arguing that neither U.S.D. nor S.T.S. knew or should have known that Davidson had a propensity to sexually molest children. U.S.D. again argued that it should be granted immunity under the discretionary function provision of the KTCA.

The trial court denied the motion, finding that there was sufficient evidence to send the case to the jury and that the jury should determine whether it was foreseeable that Davidson would commit a battery on one of the students he transported to and from school.

The jury returned a verdict for $1,800,000. The verdict was assessed against Davidson, the intentional tortfeasor. Fault was apportioned under K.S.A. 1990 Supp. 60-258a between U.S.D. (70%) and S.T.S. (30%). The trial court ruled that liability as between Davidson and the negligent tortfeasors would be joint and several. Judgment was entered for the plaintiff against U.S.D. for $1,260,000 and against S.T.S. for $540,000. U.S.D. prevailed on its cross-claim for indemnification against S.T.S. No appeal was taken on the cross-claim.

U.S.D. and S.T.S. appeal the judgments in favor of plaintiff. Davidson has not appealed. We affirm in part, reverse in part, and remand.

## Facts

H.R.'s parents were determined to maximize her potential. H.R. attended Starkey Developmental Center (Starkey) from June 1984 until September 1985 when she was enrolled at Bryant Elementary School (Bryant). In September 1984, Starkey pre-

pared H.R.'s social history report. The report observed that H.R. had occasional urination accidents. The report also stated: "One problem behavior that the [parents] have with [H.R.] is her dislike of seat belts. [H.R.] can release them in a second. Mrs. [R., the mother,] puts masking tape on the release button to avoid this problem. She requests that this be done on the van." Starkey records also indicated incidents of H.R. taking her clothes off.

H.R. entered Bryant at the age of five. She was placed in the trainable mentally handicapped level one class (TMH-1). A TMH-1 class is designed for students between five and eight years old with IQ's between 45 and 60.

H.R. was transported to and from school in a nine-passenger van operated by S.T.S. S.T.S. provided this transportation for U.S.D.'s special education children under a contract with U.S.D. S.T.S. had a "very good" record in performing its transportation duties and was considered superior to its predecessor.

Davidson was H.R.'s van driver from the fall of 1985 until December 1986. Davidson began driving for S.T.S. in 1984. S.T.S. requires its drivers to attend 24 hours of training, consisting of 10 hours of first aid, 8 hours of defensive driving, 2 hours behind the wheel (to go over the routes), and 4 hours of training in dealing with special students. The manager of S.T.S. testified that Davidson complained, as did all of the S.T.S. drivers, about behavior problems of the special education students. Davidson was instructed to fill out "school bus incident reports," turn them in, and speak with the principal.

H.R.'s mother testified of an encounter she had with Davidson in November 1985. Davidson was sometimes a few minutes early or late picking H.R. up. Mrs. R. asked Davidson to park 5 or 10 feet forward so that she could see the van from her kitchen window. Davidson became angry, waved his hands, yelled, and was "out of control." He asked her to close the van door. Mrs. R. refused until he settled down. Davidson started to drive off, and Mrs. R. had to close the door as he was driving away.

Mrs. R. called Jerry Burns, the Bryant principal, to report the incident. Mrs. R. was concerned about the children because Davidson was "out of control." Burns said he would see if he could switch Davidson to another route. Burns later told Mrs. R. the switch was not feasible.

Mrs. R. testified that the day after the van door incident, Davidson insisted that H.R. sit in the front passenger seat next to him. Following the door incident, Mrs. R. noticed a change in H.R.'s behavior. H.R. became depressed, began wetting the bed, and became mean. Mrs. R. characterized this behavior as "acting out."

Mrs. R.'s babysitter was also having a problem with Davidson (horn honking, rude, and in a hurry) and asked that Mrs. R. call the school. Mrs. R. called Burns; Burns said he would handle it. Mrs. R. asked Burns if she could call the bus company. Burns said it was school policy to go through the school.

H.R.'s behavior gradually worsened in the spring of 1986. However, when H.R. attended summer school and was driven there by a different bus driver, her behavior improved. The bed wetting stopped and she was well-behaved at school.

In the fall of 1986, Davidson was again H.R.'s van driver. In October 1986, Mrs. R. attended an Individual Educational Program (IEP) meeting with H.R.'s teacher, Kim Brown. According to Mrs. R., the teacher indicated H.R. was overly affectionate and displayed inappropriate behavior such as hugging the driver. After the IEP meeting, school personnel called Mrs. R. and told her that H.R. was drinking toilet water, licking the toilet and the bathroom floors, and plugging the toilets up, which flooded the floor.

Mrs. R. knew something was wrong. She kept calling the school and telling school personnel something was wrong. She talked about H.R.'s behavior problems with Betsy Carrell, another of H.R.'s teachers. She told Carrell about the argument with Davidson and that she was afraid Davidson was verbally taking it out on H.R. According to Mrs. R., Carrell was concerned and said she would keep an eye on Davidson. Carrell commented that Davidson seemed emotionally disturbed.

Mrs. R. testified that on December 10, 1986, she was called at work by someone from the school and told to go to the babysitter's house to meet the bus because the babysitter was not there. When she arrived at the babysitter's house, the babysitter was there and claimed to have been there all along.

Mrs. R. told investigators of the Exploited and Missing Child Unit (EMCU) that school personnel had called her on that day and told her that H.R. had been uncontrollable on the bus.

At trial, Mrs. R. testified that on the night of December 10, 1986, she sat down to have a talk with H.R. to see what the problem was. H.R. was upset. Mrs. R. stated, in her interview with EMCU investigators, that she asked H.R. if H.R. was going to be able to behave on the school bus. H.R. responded that she did not like the bus driver. She said he touches her "dinky" and pokes her "bum." H.R. uses the terms "dinky" to refer to her genital area and "bum" to refer to her buttocks.

Mrs. R. was in shock. She wrote down both the questions she had asked H.R. and H.R.'s responses. H.R. removed her clothes and began pushing on her genital area to show Mrs. R. what the bus driver had done.

The next day, December 11, 1986, Mrs. R. accompanied H.R. to school, saw Burns, and requested a meeting with Burns, the teacher, the school counselor, the school psychologist, and some-one from the bus company. She stated that she did not tell Burns what the meeting was about.

Paul Pritchard, the U.S.D. director of transportation, testified that Burns called him the morning of December 11, 1986, and told him that Mrs. R. had felt that there was a possibility H.R. was being sexually molested by Davidson. Pritchard contacted the manager of S.T.S. and requested that Davidson be taken off the route until the matter was investigated.

A meeting was set up for that afternoon. Mr. and Mrs. R., Burns, Pritchard, Kim Brown (H.R.'s teacher), and Barbara White, Security Supervisor for U.S.D., attended the meeting. Mrs. R. repeated what H.R. had told her. Mrs. R. testified that Burns said he knew what the meeting was going to be about. According to Mrs. R., Burns said, in hindsight, he should have thought something was wrong when Mrs. R. had complained about Davidson and when he had seen H.R. sitting on Davidson's lap. According to Mrs. R., Brown stated at the meeting that it frustrated her that Davidson insisted H.R. sit in the front seat.

Mrs. R. stated: "I never in my wildest dreams would ever have dreamt that something so horrible was going on, but I knew that there was something that this man was—that something was up-

setting my daughter about this man." Mrs. R. testified if she had known these things (H.R. sitting on Davidson's lap and Davidson insisting that H.R. sit up front), she would have been able to piece the problem together. Mrs. R. had testified earlier that she knew prior to the meeting that Davidson required H.R. to sit in the front seat.

Brown testified about H.R.'s behavioral problems. In addition to the behavior observed by Mrs. R., Brown related that H.R. pinched and hit other children and took her clothes off in the bathroom. Brown also noticed H.R. masturbating from time to time. Brown recalled that she told Mrs. R. about the masturbation in the fall of 1986 before the report of molestation. According to Mrs. R., she was not told that H.R. was masturbating until the 1987 spring I.E.P. meeting. Brown observed that other children in her class masturbated. She did wonder, concerning H.R., if something was going on. Brown knew that Mrs. R. was divorced and wondered if Mrs. R. was dating. Brown talked about H.R. with Mrs. R. They discussed the fact that there had been a recent divorce and there were changes going on in the home. Brown did not suspect abuse.

Brown was frustrated that Davidson insisted that H.R. be the last one to enter the bus because Davidson was having trouble with H.R. while he waited for all the children to be loaded. She felt that loading was his responsibility, not hers. Brown observed that H.R. never indicated a reluctance to get on the bus. Brown had no indication that Davidson might have a propensity to sexually molest one of his student passengers.

Following the December 11 afternoon meeting, Burns reported the allegations of H.R.'s sexual molestation to the Kansas Department of Social Rehabilitation Services. On December 18, 1986, the case was assigned to Detective Pamela Horn of the Wichita Police Department and her social work partner, Dan Crask, both of the EMCU. Horn and Crask investigated the incident. Their report was admitted into evidence. H.R. told Horn and Crask that Davidson had "poked" her. H.R. also told them that Davidson poked other students on H.R.'s bus.

Horn and Crask interviewed Tara and Rosie, also students on H.R.'s bus. Tara stated that the bus driver was a "good man."

The interviews were not productive. Other students and their parents, were not interviewed.

Horn testified that she checked in the Kansas towns where Davidson had lived. He had never been convicted of, arrested for, or reported as a suspect in any crime. Horn found no information that Davidson had ever been involved in any sort of sexual molestation.

A pediatrician examined H.R. on January 2, 1987. H.R. told the doctor that the bus driver had "poked" her with a finger, a knife, and a marble. The poking occurred from behind while she was on the bus driver's lap. The results of H.R.'s genital exam were consistent with a blunt, penetrating trauma. The doctor testified concerning a number of signs indicative of sexual abuse.

Davidson denied the allegations. He recalled that he had problems with H.R. from the first day. H.R. did not want to stay in her seat belt. She bothered the other children. Davidson required H.R. to sit in the front seat because he could not handle H.R. in the back of the van. Davidson admitted allowing the students, other than the "bigger kids," to sit on his lap.

Davidson denied that he had sexually molested anyone. In response, plaintiff presented two witnesses who testified Davidson had molested one of them at the age of 11 in the presence of the other, who was then 7 years old.

According to Davidson, he reported H.R.'s behavioral problems. He wrote up discipline slips (school bus incident reports) until the bus supervisor, William T. Benjamin, told him not to. Davidson stated Benjamin said that Burns did not like the slips to be written up. Davidson complained to Nelda Treadwell, manager of S.T.S., quite a bit and was told to write up slips until something was done at the school. He stated, "That's why I was writing so many." According to Treadwell, Davidson should not have stopped but should have continued to turn them in. Even though the slips Davidson wrote up were not sent out, he wrote up more than any other driver.

Davidson testified that he reported the trouble he was having with the children to Treadwell, the dispatchers, Benjamin, and to Brown throughout the three semesters. Burns would hardly talk to the S.T.S. drivers, but Davidson did talk with Burns a time or two. Each time Burns "told him off" and hollered at him,

saying that S.T.S. did not have any good drivers and that Burns was going to call Treadwell. Davidson responded,

"I says here's the radio. I got a little loud talking to him because he was just a hollering. I said here's the radio, she's there, call her, I'll talk to her on the phone. He never once ever called Treadwell to discuss the problems at all and he knew."

Nothing was done to help Davidson's problems.

Benjamin testified at trial. No one asked him about the failure to follow the discipline slip procedure. Benjamin explained that it is not uncommon for the affectionate TMH children to sit on the laps of their bus drivers while waiting for the bell. He observed that TMH children also commonly sit on the laps of teachers.

Burns also testified at trial, but was not asked if he knew slips were not being turned in. Burns recalled that Davidson had difficulty with the children and submitted school bus incident reports on numerous occasions. According to Burns, the school's copies of the incident reports concerning H.R. are no longer in existence because the school's file is purged at the end of each year.

The school bus incident reports are five-copy forms. A copy of the form is distributed to the parent, principal, bus contractor, driver, and district transportation department. Mrs. R. became aware of the incident reports after "all this happened" (after H.R. had explained her experiences with the bus driver). Mrs. R. received a report from a bus driver in March of 1988. Thurman Mitchell, a former Field Supervisor of Student Transportation Services, testified at trial that if he did not receive a copy of the report or did not receive a communication from parent or principal, he would have no way of knowing that a problem existed. A problem with Davidson was not brought to Mitchell's attention. Mitchell stated that had the circumstances concerning H.R. been brought to his attention, he would have requested a conference with the driver, the parents, and the school administration to resolve it.

H.R.'s teacher in the fall of 1987 believed H.R. was one of her brightest students. The teacher observed no evidence of academic regression and stated that H.R. had one of the highest progress rates of her students.

### Foreseeability of Propensity to Sexually Molest—Summary Judgment—Directed Verdict

U.S.D. and S.T.S. appeal the denial of their motions for summary judgment and directed verdict on the issue of negligent retention and supervision of Davidson. They argue that they cannot be held liable for Davidson's intentional criminal act of sexual molestation unless they knew or should have known of Davidson's particular propensity to sexually molest. They reason that no evidence was presented which would allow the jury to find that either U.S.D. or S.T.S. knew or should have known of such a propensity. The trial court erred, they contend, in denying their motions for summary judgment and for a directed verdict and in refusing to specifically instruct on their knowledge of Davidson's propensity to sexually molest.

*Amicus curiae* Kansas Association of School Boards (KASB) endorses the U.S.D.-S.T.S. argument. In addition, KASB asserts that if we find the evidence in this case sufficient to make sexual molestation foreseeable, school districts will be forced to incur the expense of hiring school bus monitors.

Plaintiff asserts: (1) U.S.D. and S.T.S. may be liable if any harm to H.R. was foreseeable; (2) the precise injury sustained need not be foreseeable; (3) the issue of foreseeability is a question of fact for the jury; (4) the jury was properly instructed; and (5) the verdict is supported by the evidence. The plaintiff also contends that, even if the standard of foreseeability asserted by U.S.D. and S.T.S. is the proper standard, there is evidence that the sexual abuse of H.R. was foreseeable.

A party seeking summary judgment bears a heavy burden. We have repeatedly stated the rules controlling summary judgment. A recent recitation is found in *Hammig v. Ford,* 246 Kan. 70, 72-73, 785 P.2d 977 (1990).

When the denial of summary judgment is challenged on appeal, this court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Patterson v. Brouhard,* 246 Kan. 700, 702, 792 P.2d 983 (1990).

In ruling on a motion for a directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn

from the evidence in favor of the party against whom the ruling is sought. Where the evidence is such that reasonable minds could reach different conclusions, the motion must be denied and the matter submitted to the jury. On appeal, this court applies the same standard as the trial court. *Holley v. Allen Drilling Co.,* 241 Kan. 707, 710, 740 P.2d 1077 (1987).

U.S.D., S.T.S., and the plaintiff rely on *Hollinger v. Stormont Hosp. & Training School for Nurses,* 2 Kan. App. 2d 302, 578 P.2d 1121, *rev. denied* 225 Kan. 844 (1978). In *Hollinger,* plaintiff was injured when an employee of the defendant hospital attempted to play a prank on her. The employee's employment records indicated that his work was unsatisfactory. The hospital knew that the employee had a tendency to talk with others rather than complete his work; that he was careless in failing to return his equipment to storage areas; and that on one occasion a visitor to the hospital had fallen in an area where the employee was buffing the floor without displaying appropriate warning signs. Hollinger sued the hospital, relying on respondeat superior and negligent hiring, supervision, and retention. The trial court sustained the hospital's motion for summary judgment as to the issue of respondeat superior. Hollinger appealed from a verdict in favor of the hospital on the negligence issue, arguing that the negligent retention instruction was improper.

The Court of Appeals, in approving the trial court's negligent retention instruction, reviewed Kansas negligent retention case law. Following its review, the *Hollinger* court stated:

"The gist of instruction No. 3 is that there must be some causal relationship between the dangerous propensity or quality of the employee, of which the employer has or should have knowledge, and the injuries suffered by the third person; the employer must, by virtue of knowledge of his employee's particular quality or propensity, have reason to believe that an undue risk of harm exists to others as a result of the continued employment of that employee; and the harm which results must be within the risk created by the known propensity for the employer to be liable." 2 Kan. App. 2d at 307.

The only other Kansas case on negligent hiring or retention is *Plains Resources, Inc. v. Gable,* 235 Kan. 580, 682 P.2d 653 (1984). In *Gable,* Higgins, an employee of defendant Empire Drilling Company (Empire), intentionally sabotaged one of plain-

tiff Plains Resources, Inc.'s (Plains) wells. The trial court found that Empire knew, or had reason to know, of Higgins' propensities and was liable under the theory of negligent retention of Higgins. The finding was based on Higgins' failure to maintain the equipment, his attitude, his comments toward Plains' personnel, and his statements of past criminal escapades. Higgins had informed Empire of his intended sabotage. We affirmed the trial court.

In the case at bar, the trial court gave the following negligent retention instruction:

### "NO. 9

"*All persons entrusted with children have a special responsibility to supervise their charges.*

"An employer may be negligent when it has reason to know that an employee, because of his qualities, is likely to harm others. If the dangerous quality of the employee causes harm, the employer may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor.

"Such an employer is not liable merely because the employee is incompetent or careless. If liability results, it is because, under the circumstances, the employer has not taken the care which a reasonable and prudent man would take in retaining the employee for the work at hand. What precautions must be taken depend upon the situation. One can normally assume that another who offers to perform simple work is competent and is not dangerous to others.

"Liability results under this rule not because of the employer-employee relationship of the parties, but only if the employer had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm. However, it is not necessary that the precise nature of the injury alleged by plaintiffs would have been foreseen by the employer.

"School authorities are required by law to exercise reasonable care and supervision for the safety of the children under their control.

"A school is required to act when a child, while in its charge, is threatened by a third party, and it must make reasonable efforts to avoid injury to the child.

"Teachers, school administrators, and school employees are required to report promptly any suspicion of sexual abuse to the department of social and rehabilitation services. The failure to do so is a violation of Kansas law and is negligence."

U.S.D. and S.T.S. objected to instruction No. 9. U.S.D. and S.T.S. submitted and requested the following instruction:

"If you find that plaintiff has met her burden of proof in establishing that defendant Specialized Transportation Services, Inc. was negligent, you must then decide whether such negligence was the cause of plaintiff's claimed injury. There must be some causal relationship between the claimed dangerous propensity or quality of defendant Davidson, of which his employer, Specialized Transportation Services, Inc. had or should have had knowledge, and the injuries suffered by plaintiff; Specialized Transportation Services, Inc. must, by virtue of knowledge of defendant Davidson's particular quality or propensity, have had reason to believe that an undue risk of harm existed to others as a result of the continued employment of defendant Davidson; and the harm which [is] claimed by plaintiff must be within the risk created by a known propensity in order for Specialized Transportation Services, Inc. to be liable. That is, plaintiff must prove that Specialized Transportation Services, Inc. knew or should have known that defendant Davidson had a propensity which created a risk that he would sexually molest [H.R.]."

U.S.D. and S.T.S. contend that their requested instruction was modeled after the language in *Hollinger,* 2 Kan. App. 2d at 307.

Instruction No. 9 given by the trial court in the instant case followed instruction No. 3 in *Hollinger,* which was approved by the Court of Appeals. *Hollinger,* 2 Kan. App. 2d at 305-06, 308.

We have stated the rules regarding appellate review of jury instructions in *Bechard v. Concrete Mix & Construction, Inc.,* 218 Kan. 597, 600-01, 545 P.2d 334 (1976).

The trial court in the case at bar did not rule on the issue of the scope of foreseeability until after the close of evidence when the U.S.D.-S.T.S. motion for a directed verdict was denied. At that time, the trial court ruled that there was sufficient evidence to submit the case to the jury to determine whether it was foreseeable that Davidson would commit a battery on one of the students. The trial court apparently rejected the U.S.D.-S.T.S. contention that they would only be liable if they knew or should have known of Davidson's *particular* propensity to sexually molest.

In closing argument, U.S.D. and S.T.S. explained their interpretation of instruction No. 9 to the jury. U.S.D. and S.T.S. argued that before they could be found liable for H.R.'s injuries they had to have foreseen that Davidson had a propensity for sexual molestation and, thus, that children were at risk.

U.S.D and S.T.S. rely on cases from other jurisdictions which they claim denied employer liability for sexual misconduct of an employee where there was no evidence that the employer knew of previous episodes of sexual misconduct *St. Paul Fire & Marine Ins. Co. v. Knight*, 297 Ark. 555, 764 S.W.2d 601 (1989); *Alma W. v. Oakland Unified School Dist.*, 123 Cal. App. 3d 133, 176 Cal. Rptr. 287 (1981); *Kane v. Hartford Accident & Indemnity Co.*, 98 Cal. App. 3d 350, 159 Cal. Rptr. 446 (1979), *Boykin v. District of Columbia*, 484 A.2d 560 (D.C. 1984); and *Bozarth v. Harper Creek Bd. of Ed.*, 94 Mich. App. 351, 288 N.W.2d 424 (1979). We have reviewed these cases and found that they involve procedural, statutory, or factual distinctions that diminish their precedential value.

The trial court's analysis of the foreseeability issue in the case at bar was correct. The jury was instructed on battery. Thus, if Davidson's battery of H.R. was foreseeable, the employer, S.T.S., may be liable. When a third party asserts a negligent retention and supervision claim against an employer, liability results not because of the employer-employee relationship, but because the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor. The employer is subject to liability only for such harm as is within that risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee that the employer had reason to believe would be likely to cause harm. However, it is not necessary that the precise nature of the injury alleged by the third-party plaintiff would have been foreseen by the employer. Therefore, instruction No. 9 as it relates to the employee-employer relationship was proper. (The last paragraph of instruction No. 9 relates to U.S.D.'s duty to report child abuse and is discussed later in this opinion.)

Whether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law. *Robbins v. Alberto-Culver Co.*, 210 Kan. 147, Syl. ¶ 5, 499 P.2d 1080 (1972).

U.S.D. and S.T.S. assert that there was no information whatsoever that Davidson had mistreated any of his student passen-

gers. There was evidence that he was rude and temperamental to parents and teachers. U.S.D. and S.T.S. contend that the evidence is insufficient to establish foreseeability to commit a battery.

Plaintiff asserts that there was sufficient evidence to establish foreseeability. Plaintiff argues that Kim Brown, H.R.'s teacher, testified that she believed H.R.'s behavioral problems were a result of exposure to sexual conduct. Brown questioned Mrs. R. about this. Mrs. R. reported Davidson's behavior, which established that children on the bus were in a sphere of risk. Mrs. R. testified that Davidson called the children names and that he was "out of control."

According to Mrs. R., Carrell stated that she thought Davidson was "emotionally disturbed." Principal Burns told Mrs. R. that he knew what the December 11, 1986, meeting was going to be about before Mrs. R. told him. Additionally, Burns told Pritchard that there was a possibility Davidson had molested H.R. before Mrs. R. told Burns about H.R.'s allegations. It may be inferred that Burns was able to foresee the harm before Mrs. R. told him.

This is a close case. We are not requiring clairvoyance in employers; however, viewing the evidence and all inferences in favor of plaintiff, the foreseeability of the risk of harm was a jury question. The trial court did not err in denying the U.S.D.-S.T.S. motions for summary judgment and directed verdict on this issue.

### The Kansas Tort Claims Act—Discretionary Function

U.S.D. asserts that it should have been granted immunity under K.S.A. 75-6104(e), the "discretionary function" exception to the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.* (KTCA). U.S.D. argues that the day-to-day supervision and retention of Davidson as a school bus driver was based on individual judgment and the exercise of discretion unrelated to regulatory mandates of the Secretary of Transportation.

Plaintiff contends that the discretionary function exception was intended to protect "formulation of policy." Plaintiff asserts that U.S.D. established a supervisory scheme over the contracted transportation services through the school bus incident report procedure and that U.S.D. personnel circumvented this reporting

procedure. Plaintiff reasons that the failure to follow established policy was a ministerial act not entitled to immunity under the discretionary function exception to the KTCA.

*Amicus curiae* KASB joins in U.S.D.'s argument that supervision and retention of employees is a discretionary function entitled to immunity under K.S.A. 75-6104(e).

The KTCA is an open-ended act making governmental liability the rule and immunity the exception. *Nichols v. U.S.D. No. 400*, 246 Kan. 93, 94, 785 P.2d 986 (1990).

K.S.A. 75-6103(a) provides:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act of omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

In K.S.A. 75-6102(c), the term "governmental entity" is defined to include a school district. Employee does not include an independent contractor under contract with the governmental entity. K.S.A. 75-6102(d). Therefore, S.T.S. is not subject to the KTCA.

K.S.A. 75-6104 states in part:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

"(e) any claim based upon the exercise or performance or the failure to exercise or perform *a discretionary function* or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." (Emphasis added.)

The burden is on the governmental entity to establish immunity under one of the exceptions in K.S.A. 75-6104. *Jackson v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984).

We have considered the discretionary function exception in several cases. The discretionary function exception may be the most important exception to liability in the KTCA. (Prior to the 1987 amendment to K.S.A. 75-6104[d] [Ensley 1984], which added the phrase "and regardless of the level of discretion involved" in what is now K.S.A. 75-6104[e], the discretionary function exception was designated as subsection [d]. The 1987 amendment is not applicable to the instant case.)

In *Robertson v. City of Topeka,* 231 Kan. 358, 361-62, 644 P.2d 458 (1982), we rejected the "planning level-operational level test" and held that the determining factor was the nature and the quality of the discretion exercised rather than the status of the employee. The "nature and quality" test was set out in *Downs v. United States,* 522 F.2d 990 (6th Cir. 1975), *i.e.,* whether the act is of "the nature and quality" which Congress intended to put beyond judicial review. 522 F.2d at 997.

In *Downs,* an FBI agent's negligent handling of an airplane hijacking situation caused the deaths of plaintiffs' decedents. The agent's negligence consisted of his failure to follow specific procedures governing hijacking situations set forth in an FBI handbook. *Downs* held that the agent's acts were not of "the nature and quality" necessary for a discretionary function. The court reasoned that the mere exercise of some judgment cannot be the test for a discretionary function because "[j]udgment is exercised in almost every human endeavor." 522 F.2d at 995. Rather, a discretionary function must involve some element of policy formulation. The relevance of the FBI handbook was that the FBI had already made the policy determination about the proper procedures in hijacking situations, and thus the agent was not making policy in responding to this particular hijacking situation.

The more a judgment involves the making of policy the more it is of a "nature and quality" to be recognized as inappropriate for judicial review. *Robertson* held that police officers were exercising a discretionary function when they refused to remove a drunken trespasser from the owner's property. 231 Kan. at 362.

In *Cansler v. State,* 234 Kan. 554, 675 P.2d 57 (1984), Cansler, a police officer, sued the State for injuries resulting from the escape of dangerous prisoners from the penitentiary. No notice of the escape was given to law enforcement officers in neighboring communities. We reasoned that the duties to confine and notify are imposed by law and are ministerial. Thus, the State's failure to do so was not discretionary and it was not entitled to immunity.

The wife and children of James Fudge brought a wrongful death and survival action against an intoxicated driver and a municipality in *Fudge v. City of Kansas City,* 239 Kan. 369, 720 P.2d 1093 (1986). Fudge was killed when his van collided with the intoxicated driver's car. It was alleged that prior to the collision, city

police officers had encountered the intoxicated driver in a parking lot and negligently failed to prevent him from driving. The jury found the City 18% at fault. The City appealed, arguing in part that it was immune under the discretionary function exception of the KTCA. The police department had a standard operating procedure manual which detailed mandatory procedures for handling a variety of police situations. The police were also subject to a general order which provided that individuals who are incapacitated by alcohol and likely to inflict physical injury to themselves or others will be taken into protective custody. We held that the City had adopted a specific mandatory set of guidelines for police to use in handling intoxicated persons that left no discretion. The City was not immune under the discretionary function exception to the KTCA. 239 Kan. at 372-75.

It is clear that failure to follow mandatory guidelines is not subject to immunity under the discretionary function exception to the KTCA. *Fudge,* 239 Kan. at 375; *Jackson,* 235 Kan. at 289-90.

"Simply stated, our more recent cases hold that the discretionary function exception is not applicable in those situations where a legal duty exists, either by case law or by statute, which the governmental agency is required to follow." *Dougan v. Rossville Drainage Dist.,* 243 Kan. 315, 322, 757 P.2d 272 (1988).

U.S.D. reasons that all the ministerial acts in K.A.R. 36-13-32, with respect to the employment of Davidson, were fulfilled. We agree. Plaintiff does not discuss K.A.R. 36-13-20 *et seq.*

K.A.R. 36-13-32 relates specifically to school bus driver qualifications. Review of K.A.R. 36-13-32 indicates that Davidson was a qualified bus driver. However, the negligent hiring claim was disposed of by the trial court's ruling prior to trial and is not in issue.

The U.S.D.-S.T.S. contract addressed pupil discipline:

"Pupil Discipline. The Operator and its drivers shall maintain careful supervision over all passengers for their safety in riding, loading, or unloading from all vehicles. *Drivers shall make prompt written reports to the Principal or principal's designee of the names and manner of conduct* of any pupils who are undisciplined or conduct themselves in such a manner as to cause serious disturbance or otherwise create a hazard to the safety and convenience of other passengers, themselves, or the operator of the vehicle. Drivers shall not discipline pupils." (Emphasis added.)

Plaintiff asserts that U.S.D. failed to follow the school bus incident report procedure. The report form is entitled, "School Bus Incident Report to Parents." The initial language states:

"Dear Parents:
"The purpose of this report is to inform you of an incident which occurred on the bus and involved your son/daughter. This incident may have jeopardized the safety and well-being of all the pupils riding the bus. You are urged to appreciate the actions taken by the bus driver and the school personnel in their attempt to resolve the problem. You are further urged to cooperate in our efforts to help your child understand the necessity for good conduct while getting to and from school."

Plaintiff argues that U.S.D. failed to follow its bus incident reporting policy. Davidson testified that he was told not to fill out so many reports. Treadwell testified that when Davidson reported he had been told not to fill out so many reports she advised him to fill the reports out anyway. The record supports plaintiff's contention that U.S.D. failed to follow the established reporting procedure.

U.S.D. procedures called for Mitchell to receive a copy of the disciplinary slip. If he noticed five or six slips in a given period of time he might investigate. Mitchell would advise drivers not to listen to school principals or to bus supervisors if they told the driver not to fill out the slips. He testified that if a driver could not handle the student on a continuing basis, the driver was switched off the route. Mitchell would have switched a driver if the problems had been continuing for over three semesters. Mitchell would have attempted to hold a conference with the driver, the parents, and the school administration to resolve the problem.

Dr. Melhorn, the pediatrician who examined H.R., testified that H.R. told her the molestation occurred more than once. According to plaintiff's expert Dr. Milner, a psychologist, the molestation occurred over a period of nine months to a year. Helen Swan, a social worker in the area of child abuse, expressed the opinion, based on her evaluation, that the sexual abuse of H.R. continued for approximately a year.

One copy of the bus incident report was to go to the parent. H.R. finally told her mother of the molestation when her mother asked H.R. why H.R. would not behave on the bus. The jury

could have reasoned that H.R. would have told Mrs. R. sooner if U.S.D. had followed its bus incident reporting procedure by forwarding the parents' copy of Davidson's incident reports involving H.R. to her mother.

The testimony indicates that had the school bus incident reporting procedure been followed, some type of remedial action may have been taken.

The development of the bus incident reporting scheme was a discretionary act involving policy formulation. What is important is that U.S.D.'s personnel failed to follow the required reporting procedure. The policy determination to implement the reporting procedures had already been made. U.S.D.'s personnel were not making policy when they decided not to follow the required reporting procedure. Under the facts in the case at bar, it was for the jury to determine whether U.S.D. would have been alerted to the danger if the reports had been made and distributed as required.

U.S.D. cites cases from other jurisdictions which hold that hiring, supervising, and retaining school employees are discretionary functions. *Doe "A" v. Special Sch. Dist. of St. Louis County*, 637 F. Supp. 1138 (E.D. Mo. 1986); *Rosacrans v. Kingon*, 154 Mich. App. 381, 397 N.W.2d 317 (1986), *lv. to appeal denied* 428 Mich. 862 (1987); *Willoughby v. Lehrbass*, 150 Mich. App. 319, 388 N.W.2d 688 (1986); and *Kimpton v. New Lisbon School Dist.*, 138 Wis. 2d 226, 405 N.W.2d 740 (Ct. App. 1987).

Each case is distinguishable from the case at bar. None of the U.S.D.-S.T.S. authorities are controlled by legislative enactments similar to the KTCA "open ended" concept of liability. In addition, none of the cited cases involve the failure of a school district to follow established procedures.

U.S.D. relies on our recent decision in *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 777 P.2d 839 (1989). *Hackler* involved a personal injury claim by a minor for injuries sustained when crossing the street from his home. The student had been let off at a school bus stop. The defendant school district advanced the KTCA discretionary function exception of K.S.A. 75-6104(e) as a defense. We affirmed the trial court's reasoning that the district had not breached any duty owing to Hackler. We did not determine the discretionary function issue.

The trial court, in the case at bar, was correct in ruling that U.S.D. is not entitled to immunity under the K.S.A. 75-6104(e) discretionary function exception to the KTCA.

### The Mandatory Child Abuse Reporting Statute

The trial court gave the following instruction (the last paragraph of instruction No. 9) over U.S.D.'s objection: "Teachers, school administrators, and school employees are required to report promptly any suspicion of sexual abuse to the department of social and rehabilitation services. The failure to do so is a violation of Kansas law and is negligence."

U.S.D. challenges the propriety of giving this instruction, reasoning the instruction was contrary to: (1) the pretrial order; (2) the uncontroverted evidence that sexual abuse was not suspected; (3) the discretionary function exception to the KTCA; and (4) the reporting statute, K.S.A. 1990 Supp. 38-1522, which grants no private right of action. (Plaintiff's claim under the child abuse reporting statute is against U.S.D. only.)

Plaintiff counters with two arguments. First, plaintiff explains that there is no specific finding the jury relied on this instruction to find U.S.D. negligent. Plaintiff suggests there was ample evidence of the breach of other duties which would explain the verdict. Second, plaintiff contends K.S.A. 1990 Supp. 38-1522 creates a private civil cause of action. K.S.A. 1990 Supp. 38-1522 establishes a duty for school teachers and administrators to report all suspicions of child abuse. Plaintiff reasons the reporting duty benefits children as a specific segment of the public intended to be protected by the statute and argues the criminal penalty provided in K.S.A. 1990 Supp. 38-1522(f) is ineffective because of problems proving a willful and knowing violation. Plaintiff asserts that Brown was sufficiently suspicious of sexual abuse to question H.R.'s mother about sexual activity in the home. Thus, according to plaintiff, there was evidence of unreported suspicion. An examination of the record reflects that Brown knew Mrs. R. was divorced and wondered if Mrs. R. was dating. Brown spoke with Mrs. R. about her recent divorce and about changes going on in the home. Brown testified she did not suspect abuse.

Plaintiff does not address the U.S.D.-S.T.S. argument that the instruction was beyond the pretrial order.

*Amicus curiae* Kansas Child Abuse Prevention Council (KCAPC) joins in plaintiff's argument asserting that K.S.A. 1990 Supp. 38-1522 does grant a private cause of action. KCAPC contends that the statute provides protection for the benefit of a class, or individuals of a class, *i.e.,* abused children.

K.S.A. 1990 Supp. 38-1522 provides in part:

"(a) When any of the following persons has reason to suspect that a child has been injured as a result of physical, mental or emotional abuse or neglect or sexual abuse, the person shall report the matter promptly as provided in subsection (c) or (e): . . . teachers, school administrators or other employees of a school which the child is attending . . . . The report may be made orally and shall be followed by a written report if requested. . . .

. . . .

"(f) Willful and knowing failure to make a report required by this section is a class B misdemeanor."

The omitted portions of subsection (a) describe other persons who are required to report suspected abuse. These persons may be categorized generally as licensed professionals. Subsection (b) states that any other person *may* report suspected abuse.

K.S.A. 38-1526 grants immunity from liability for persons who make such reports without malice.

U.S.D. first contends that the discretionary function exception of the KTCA protects school employees who exercise judgment and discretion in evaluating behaviors of children to attempt to identify a possible extrinsic source of behavior problems. For this reason, sanctions should only be imposed if the failure to report is "willful and knowing."

In the case at bar, the trial court rejected the argument, ruling that reporting suspected child abuse is a ministerial act, not a discretionary function, under the KTCA.

U.S.D. also contends that K.S.A. 1990 Supp. 38-1522 does not provide a private right of action. We agree and, consequently, need not address the discretionary function issue in the context of reporting suspected child abuse.

The relevant portion of instruction No. 9 indicated that violation of K.S.A. 1990 Supp. 38-1522 is negligence per se. However, violation of a statute alone does not establish negligence per se. The plaintiff must also establish that an individual right of action for injury arising out of the violation was intended by the leg-

islature. Statutes enacted to protect the public, therefore, do not create a duty to individuals injured as a result of a statutory violation. *Schlobohm v. United Parcel Service, Inc.*, 248 Kan. 122, 125, 804 P.2d 978 (1991).

Generally, the test of whether an individual right of action exists for violation of a statute is whether the legislature intended to give such a right. In the absence of express provisions, the legislative intent to grant or withhold such a right is determined primarily from the language of the statute. The nature of the evil sought to be remedied and the purpose the statute was intended to accomplish may also be taken into consideration. *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 804, 740 P.2d 606 (1987).

Michigan's Child Protection Law, Mich. Comp. Laws § 722.621 *et seq.* (1979), requires persons who have reasonable cause to suspect child abuse to report to authorities. The statutes specifically provide that failure to do so may result in civil liability. Mich. Comp. Laws § 722.633 (1979). *Rosacrans v. Kingon*, 154 Mich. App. at 387-88.

The following cases have held that no private cause of action exists for violation of mandatory child abuse reporting statutes: *Thelma D. v. Board of Educ. of City of St. Louis*, 669 F. Supp. 947 (E.D. Mo. 1987) (following *Doe "A" v. Special Sch. Dist. of St. Louis County*, 637 F. Supp. 1138); *Fischer v. Metcalf*, 543 So. 2d 785 (Fla. Dist. App. 1989) (*en banc*); and *Borne v. N.W. Allen County School Corp.*, 532 N.E.2d 1196 (Ind. App. 1989). See *Annot.*, 73 A.L.R.4th 782, § 11[b].

Our research has indicated only one jurisdiction which has held that a mandatory child abuse reporting statute impliedly grants a private right of action. *Landeros v. Flood*, 17 Cal. 3d 399, 131 Cal. Rptr. 69, 551 P.2d 389 (1976). See *Annot.*, 73 A.L.R.4th 782, § 11[a].

In *Landeros*, 17 Cal. 3d 399, the minor plaintiff, who had been abused by her mother and her mother's common-law husband, sued a doctor for failure to report suspected child abuse. The doctor had treated the minor plaintiff in an emergency room (comminuted spiral fracture of the right tibia and fibula, bruises over entire back, superficial abrasions on other parts of the body, and nondepressed linear fracture of skull—all symptomatic of the

medical condition known as the battered child syndrome). The California Supreme Court held that a private cause of action exists for *intentional* violation of the reporting statute. The court stated: "If plaintiff wishes to satisfy that requirement [violation of statute], it will be necessary for her to persuade the trier of fact that defendant Flood (the treating doctor) actually observed her injuries and formed the opinion they were intentionally inflicted on her." 17 Cal. 3d at 415.

U.S.D. submits that no private cause of action was intended by the legislature and that we should not create one. Legislative creation, rather than judicial creation, is a persuasive policy argument.

K.S.A. 38-1521 states:

"It is the policy of this state to provide for the protection of children who have been subject to physical, mental or emotional abuse or neglect or sexual abuse by encouraging the reporting of suspected child abuse and neglect, insuring the thorough and prompt investigation of these reports and providing preventive and rehabilitative services when appropriate to abused or neglected children and their families so that, if possible, the families can remain together without further threat to the children."

The purpose of the reporting statute is to provide for the protection of children who have been abused by encouraging the reporting of suspected child abuse and by insuring the thorough and prompt investigation of such reports. There is no express indication of legislative intent to impose any liability for failure to report. The decision to report suspected abuse should be based on something more than suspicion.

The Indiana Court of Appeals in *Borne*, a case involving sexual abuse of a special education elementary school girl by classmates during a school field trip, considered the reporting issue. In holding that no private cause of action existed for failure to report, the Indiana court stated:

"When the provisions of the act are considered as a whole, there is no apparent intent to authorize a civil action for failure of an individual to make the oral report that may be the means of initiating the central procedures contemplated by the act. Furthermore, such an action is not authorized at common law and its maintenance would raise substantial questions of causation since the failure would not in the direct sense be a proximate cause of the injury to the child. It would, we believe, misdirect judicial time and attention from the very real problems of children in need of services in

favor of pursuing collateral individuals, who are presumably capable of responding in money damages, on the ground that they knowingly failed to make an oral report. We concluded that was not within the legislative purpose of the act." 532 N.E.2d at 1203.

If the legislature had intended to grant a private right of action in K.S.A. 38-1522 it would have specifically done so. The statute was revised in 1983, 1985, 1986, 1987, and 1988. The legislature has not utilized the amendment opportunities to add a private cause of action. No private cause of action exists under K.S.A. 1990 Supp. 38-1522. The child abuse reporting portion of instruction No. 9 should not have been given.

Did the giving of the instruction result in prejudicial error? Under the facts of this case, we think not.

The objectionable portion of instruction No. 9 related only to U.S.D. The judgment entered against U.S.D. is to be paid by S.T.S. because U.S.D. prevailed on its cross-claim for indemnification against S.T.S. If the case were remanded for retrial any alteration in the percentages of negligence (70% U.S.D.—30% S.T.S.) would not affect the total of 100% to be assessed between the two defendants. S.T.S., under the indemnification agreement cross-claim judgment, would be responsible for payment of the amount awarded against U.S.D. upon retrial.

### Comparison of Fault

The jury returned the verdict form, which provides in part:

"1. Did H. Ardon Davidson commit a battery upon [H.R.]?
Yes __X__ No _____
(Number of jurors in agreement __10__ )

"2. If you answer Question #1, 'yes,' *do you find that such battery occurred at least in part due to the acts or omissions of Specialized Transportation Services, Inc., and/or Unified School District 259?*
Yes __X__ No _____
(Number of jurors in agreement __11__ )

"3. If you answer question #2 'yes,' then considering the fault of Specialized Transportation Services, Inc., and Unified School District 259 at one hundred percent, what percentage of the fault is attributable to each of them?

| | |
|---|---|
| Specialized Transportation Services, Inc. (0% to 100%) | 30% |
| Unified School District 259 (0% to 100%) | 70% |
| Total | 100% |
| "(Number of jurors in agreement | 11 )" |

(Emphasis added.)

Judgment was entered against Davidson for $1,800,000, the total amount of the jury verdict. Judgment was entered against S.T.S. for $540,000 (30% of the total verdict) and against U.S.D. for $1,260,000 (70% of the total verdict).

U.S.D. and S.T.S. argue the trial court erred in failing to instruct the jury to compare their fault (negligence) with Davidson's fault (intentional). U.S.D. and S.T.S. assert that the trial court's refusal to instruct as requested is inconsistent with the principle that negligent tortfeasors shall not be liable for more than their fair share of the loss. See *Brown v. Keill,* 224 Kan. 195, 580 P.2d 867 (1978). U.S.D. and S.T.S. also contend that comparison of intentional acts and negligent acts is an issue of first impression in Kansas. *Amicus curiae* Kansas Association of Defense Counsel (KADC) supports the U.S.D.-S.T.S. argument.

Plaintiff disagrees with the assertion that the comparative fault issue is one of first impression. Plaintiff reasons that we have refused to compare the fault of negligent tortfeasors with that of intentional tortfeasors, citing *Gould v. Taco Bell,* 239 Kan. 564, 722 P.2d 511 (1986), and *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.,* 234 Kan. 682, 675 P.2d 864 (1984). Plaintiff's analysis is correct.

Plaintiff also asserts that allowing U.S.D. and S.T.S. to compare their fault with Davidson would allow an intentional tortfeasor to reduce his/her share of damages. Plaintiff misconstrues the U.S.D.-S.T.S. argument. U.S.D. and S.T.S. are not arguing that Davidson's fault should be reduced under comparative negligence.

*Amicus curiae* Kansas Trial Lawyers Association (KTLA) reasons that *M. Bruenger* and *Gould* control and should be upheld. KTLA suggests that it would be unfair to allow the intentional act of one defendant to be compared with the negligent act of a defendant whose duty it is to protect the plaintiff from the act committed by the intentional tortfeasor.

In *M. Bruenger,* the plaintiff's truck was stolen due to the negligence of a bailee, defendant Dodge City Truck Stop. The trial court allowed the jury to compare the negligence of the bailee with the fault of the thief. We reversed and held the trial court erred in allowing the comparison. We ruled that a bailee

is required to exercise reasonable care to prevent the theft. The harm is complete when the theft occurs. 234 Kan. at 687.

In *Gould,* a customer of Taco Bell was injured by another patron, and Taco Bell's manager negligently delayed rendering assistance to him. The trial court denied Taco Bell's motion to join the intentional tortfeasor for fault comparison purposes. The trial court in *Gould* reasoned that intentional acts of a third party cannot be compared with the negligent acts of a defendant whose duty it is to protect the plaintiff from the intentional acts committed by the third party. We agreed. Taco Bell attempted to distinguish *M. Bruenger,* asserting that *M. Bruenger* is limited to a bailment situation. We disagreed. Justice Herd, speaking for the court, stated:

"[W]e are not comparing apples and oranges. We look to the nature of the duty owed in each instance. A bailee owes a duty of reasonable and ordinary care to prevent the theft of bailed property. The premises owner owes a duty to use reasonable and ordinary care for the safety of invitees. The duty is the same in both cases. Accordingly, our holding in *M. Bruenger* is applicable to the present case and the trial court did not err in denying appellant's motion to join Karen Brown [the intentional actor] as an additional party to the action." 239 Kan. at 571.

U.S.D., S.T.S., and *amicus curiae* KADC rely on two law review articles. Westerbeke, *Survey of Kansas Law: Torts,* 33 Kan. L. Rev. 1 (1984); Westerbeke and Robinson, *Survey of Kansas Tort Law,* 37 Kan. L. Rev. 1005 (1989).

In 33 Kan. L. Rev. 1, Professor Westerbeke agreed with the Court of Appeals' refusal to provide a proportionate fault reduction of the intentional tortfeasors' liability in *Lynn v. Taylor,* 7 Kan. App. 2d 369, 642 P.2d 131 (1982). However, he stated that the imposition of joint and several liability on the negligent tortfeasor is unsound. Westerbeke proposed a "hybrid" approach, stating:

"A third, and arguably preferable, choice involves a hybrid approach in which the intentional tortfeasors are jointly and severally liable for the total amount of damages, but the negligent tortfeasor is liable only for that portion of the total damages representing his proportionate fault." 33 Kan. L. Rev. at 33.

*M. Bruenger* and *Gould* have been criticized by use of the following hypothetical situation:

"Assume that a visibly intoxicated third person in the restaurant negligently stumbles into and knocks down one guest, then intentionally pushes down another guest. In each case the restaurant breached its duty in the same manner—by failing to remove the intoxicated person from the premises before he harmed a guest. The results, however, vary. The restaurant is liable for only a proportionate fault share of the damages suffered by the first guest, but is jointly and severally liable for all damages suffered by the second guest." 37 Kan. L. Rev. at 1049.

No judicial authority in support of the hybrid approach has been cited by U.S.D., S.T.S., or *amicus curiae* KDAC, or in the articles relied on by the parties. We acknowledge the contradiction in the "restaurant guest" example.

We have considered the "hybrid approach" but elect to follow the precedential path marked by *M. Bruenger* and *Gould.*

The asserted U.S.D.-S.T.S. act of negligence in the case at bar was the failure to prevent Davidson from committing the intentional act of battery. We note that the verdict form required linkage between the intentional act of Davidson and U.S.D.-S.T.S. before consideration of any percentage of fault attributable to U.S.D.-S.T.S. Negligent tortfeasors should not be allowed to reduce their fault by the intentional fault of another that they had a duty to prevent.

### Application of the $500,000 K.S.A. 75-6105
### Maximum Liability Provision

U.S.D. and S.T.S. entered into a "Pupil Transportation Services Agreement." Under this agreement, U.S.D. required S.T.S. to obtain insurance with the following liability limits:

"A. Minimum liability coverage: Bodily injury liability in an amount not less than $500,000 for each person; in an amount not less than $1,000,000 for each occurrence; and in an amount not less than $500,000 for property damage for each student.

"B. Excess liability insurance coverage with minimum limits of $1,000,000 per occurrence."

The agreement also provided:

"The District, its employees, agents, and members of the Board of Education, shall be named as additional insureds on the Operator's aforementioned insurance policies.

. . . .

"The purchase of insurance by the Operator shall not constitute a waiver of exemption from liability of the District under the Kansas Tort Claims

Act, K.S.A. § 75-6101 *et seq.* The Operator or its Employees are not and shall not be considered agents or employees of the District. The Operator is and shall be considered an independent contractor."

The agreement also included a hold harmless indemnification clause which required S.T.S. to indemnify U.S.D. for any loss arising from operations connected with the agreement. S.T.S. purchased the required insurance naming both U.S.D. and the City of Wichita as additional insureds. No additional premium was charged for adding U.S.D., its employees, agents, and board members. The policy issued to S.T.S. by Insurance Company of North America did not limit the amount of coverage extended to U.S.D. to $500,000. No distinction as to coverage was made between S.T.S. as an insured and U.S.D. and its employees, agents, and board members as additional insureds. U.S.D. purchased its own liability policy from a different carrier with a limit of $500,000.

K.S.A. 75-6105(a) states: "Subject to the provisions of K.S.A. 75-6111 and amendments thereto, the liability for claims within the scope of this act shall not exceed $500,000 for any number of claims arising out of a single occurrence or accident."

K.S.A. 75-6111 provides in part:

"With regard to claims pursuant to the Kansas tort claims act, insurers of governmental entities may avail themselves of any defense that would be available to a governmental entity defending itself in an action within the scope of this act, except that the limitation on liability provided by subsection (a) of K.S.A. 75-6105 and amendments thereto shall not be applicable *where the contract of insurance provides for coverage in excess of such limitation* in which case the limitation on liability shall be fixed at the amount for which insurance coverage has been purchased . . . ." (Emphasis added.)

At the hearing to formalize the journal entry, Insurance Company of North America (the S.T.S. carrier) and Pacific Employers Insurance Company (the U.S.D. carrier), appeared as intervenors. Counsel for the intervenors carried the U.S.D.-S.T.S. argument that the judgment against U.S.D. should be limited in the amount of $500,000. The movants (U.S.D., S.T.S., and the two insurance companies) acknowledged K.S.A. 75-6111 but argued that the statute required that U.S.D. actually purchase the insurance with public funds. In the case at bar, the movants contend U.S.D. only purchased $500,000 in coverage (the Pacific Employers pol-

icy) while S.T.S. purchased the $2,000,000 policy (Insurance Company of North America). The movants also contend that the provision in the U.S.D.-S.T.S. agreement, which provided that purchase of insurance by S.T.S. shall not constitute a waiver of exemption from liability under the KTCA, is significant. The movants argued that the indemnity agreement was not intended to waive the liability limit.

The intervening insurance companies are not before us on appeal.

The trial court ruled there was insurance in excess of $500,000 and the limitation was waived. The journal entry on the cross-claim entered judgment for U.S.D. against S.T.S. for $1,260,000 (70% of the total judgment of $1,800,000).

U.S.D.-S.T.S. assert that the requirement in the agreement that S.T.S. purchase insurance naming U.S.D. as an additional insured was to secure U.S.D.'s general right to indemnity also granted under the agreement. U.S.D.-S.T.S. contend that under K.S.A. 75-6111(a) the $500,000 liability limit is waived only if U.S.D. purchases insurance with coverage exceeding $500,000.

U.S.D. advances the policy argument that if the action taken in the case at bar is construed as a "purchase of insurance" constituting a waiver of the K.S.A. 75-6105(a) maximum liability provision, government entities will insist that their contractors limit liability coverage to $500,000. U.S.D. reasons that public policy and citizen interests are promoted by insisting that private contactors insure themselves according to the risk without fear that the government entity will waive the liability limit.

*Amicus curiae* KASB joins in U.S.D.'s policy arguments. We acknowledge the U.S.D.-*amicus* policy concerns; however, in our view, the expressed apprehension is more imagined than real.

The U.S.D.-S.T.S. arguments are not persuasive. First, we note the language of the agreement relied on by U.S.D. and S.T.S. states that the purchase of insurance by S.T.S. shall not constitute a waiver by U.S.D. of its liability exemptions under the KTCA. The KTCA liability exemptions are set out in K.S.A. 75-6104 (see paragraphs [a] legislative function, [b] judicial function, [c] law enforcement, [e] discretionary function, and others enumerated in the statute). The K.S.A. 75-6105 $500,000 limit on liability and the reference in K.S.A. 75-6111 to a contract of

insurance in excess of the $500,000 limit do not refer to KTCA liability exemptions but to monetary limits on liability exposure. The U.S.D.-S.T.S. reliance on the language of the agreement to support their $500,000 limit argument is misplaced.

Second, U.S.D. and S.T.S. overlook the statutory language of K.S.A. 75-6111, which states, "[A] governmental entity may *obtain* insurance . . . ." (Emphasis added.) In the case at bar U.S.D. obtained insurance by contractual requirement. One of the S.T.S. obligations was the purchase of insurance to cover U.S.D. as an additional insured. The U.S.D.-S.T.S. emphasis on the word "purchase" is not compelling. U.S.D. prudently sought to cover any liability exposure it might have arising from the S.T.S. transportation agreement. U.S.D. contracted for a hold harmless indemnification from S.T.S. and for insurance coverage on the S.T.S. policy as an additional insured. S.T.S. complied with the terms of the agreement. U.S.D. received what it contracted for.

The $2,000,000 limit on U.S.D. liability as an additional insured applies only to claims arising under the S.T.S. transportation agreement. The public policy apprehension voiced by U.S.D. and *amicus* KASB is dispelled by insuring the district for $500,000, as an additional insured, and thus, limiting the district to the K.S.A. 75-6105 $500,000 liability.

The trial court did not err in refusing to limit the judgment against U.S.D. to $500,000.

### The Damage Verdict

The trial court gave the following instruction concerning damages:

"NO. 12

"If you find for [H.R.], you will then determine the amount of her recovery. You should allow the amount of money as will reasonably compensate her for her injuries and losses resulting from the occurrence in question, including any of the following shown by the evidence.

"1. Pain, suffering, disabilities and any accompanying mental anguish suffered by [H.R.] to date and those she is reasonably expected to experience in the future;

"2. The reasonably necessary increased cost of supervised living expenses, reduced to present value; and

"3. Loss of income which is reasonably certain to be lost in the future, reduced to present value.

"In arriving at the amount of your verdict, you should consider [H.R.'s] age; condition of health, before and after; and the nature, extent, and duration of the injuries. For such items as pain, suffering, disability, and mental anguish, there is no unit value and no mathematical formula the court can give you. You should award such sum as will fairly and adequately compensate her, the amount to be awarded resting within your sound discretion.

"The total amount of your verdict may not exceed $5,000,000.00, the amount of plaintiff's claim."

The jury returned a special verdict form:

"4. If the answer to either of the above is 'yes', what are [H.R.'s] damages in each of the following categories?

| | | |
|---|---|---|
| (A) | Pain and suffering | $200,000 |
| (B) | Pain and suffering reasonably expected to be sustained in the future | $100,000 |
| (C) | Disability to date | $100,000 |
| (D) | Disability reasonably expected to be sustained in the future | $100,000 |
| (E) | Mental anguish to date | $200,000 |
| (F) | Mental anguish in the future | $100,000 |
| (G) | Increased cost of housing in the future | $700,000 |
| (H) | Future wage loss | $300,000 |
| "(Number of jurors in agreement | | 11 )" |

U.S.D. and S.T.S. assert: (1) The evidence supporting the $200,000 award for pain and suffering was insufficient; (2) there was no evidence to support an award for future pain and suffering, disability to date, future disability, mental anguish to date, and future mental anguish; and (3) the $700,000 award for increased housing costs in the future and the $300,000 future wage loss award were based on speculation.

Plaintiff asserts that a prima facie case on these damage elements was presented to the jury.

Plaintiff's counsel initially told the jury that plaintiff was not seeking damages for pain and suffering and mental distress; however, counsel later informed the jury that plaintiff did suffer these items of damages. The trial court so instructed, and the jury awarded damages on these items. Counsel's earlier remarks do not bar recovery.

In an action for personal injuries, the trial court should instruct the jury only on those items of damages upon which there is

some evidence to base an award. *Bridges v. Bentley,* 244 Kan. 434, 441, 769 P.2d 635 (1989).

Ordinarily, the assessment of damages in a personal injury action is exclusively the province of the jury. *Germann v. Blatchford,* 246 Kan. 532, 537, 792 P.2d 1059 (1990).

When a verdict is attacked on the ground that it is contrary to the evidence, this court does not reweigh the evidence. If the evidence with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the successful party below, will support the verdict, we should affirm. *Tice v. Ebeling,* 238 Kan. 704, 708, 715 P.2d 397 (1986).

A review of the special verdict form and the record indicates that there is evidence to support the elements of damage on the special verdict form, with the exception of the category of future pain and suffering.

### (A) Pain and Suffering

H.R. told Detective Pamela Horn and Social Worker Dan Crask of EMCU that she cried when Davidson "poked" her. Plaintiff's expert, Social Worker Helen Swan, testified that H.R. said she cried when Davidson "poked" her. Swan said that this was her way of saying the event was painful. Both Swan and Dr. Milner were of the opinion that the abuse occurred over an extended period of time—nine months to a year.

Although the evidence was minimal and the award generous, the record supports this element of damage.

### (B) Future Pain and Suffering

There is no evidence in the record to support this element of damage. The only evidence of future suffering relates to future mental anguish, a separate element of damages.

### (C) Disability to Date and
### (D) Future Disability

Dr. Milner testified that H.R. was progressing until kindergarten, then her improvement stopped. H.R. is now regressing intellectually. The early years for those affected by Down's syndrome are very important for development. If H.R. does not "catch up" with her prior rate of development, which does not appear likely at this point, H.R. will have to be in a structured

environment of some sort. Dr. Milner also testified that H.R. is suffering from post-traumatic stress syndrome and the symptoms are continuing to occur. Dr. Milner believed that H.R. will not recover from this trauma for a considerable length of time.

### (E) Mental Anguish to Date and
### (F) Mental Anguish in the Future

Dr. Milner testified that H.R. talked, with a lot of anxiety, about the bus driver. H.R. spontaneously began to masturbate in front of Dr. Milner at the mention of the bus driver. Children do not normally masturbate in public unless there is anxiety about something they are talking about. Depression and anxiety were apparent in H.R. earlier, but are not so much a problem now.

According to Swan, H.R. showed a lot of embarrassment, guilt, anger, and anxiety. Swan observed that H.R. showed signs of long-term damage. Because H.R. was (1) penetrated rather than just fondled, (2) threatened and told not to tell, and (3) abused for approximately a year, Swan testified that H.R. "comes up" on the severe side of trauma. H.R. still has extensive emotional damage and still suffers from the trauma.

### (G) Increased Cost of Housing in the Future

Dr. Milner's opinion was that H.R. might have been a candidate for independent living when she reached adulthood before this trauma occurred. Dr. Milner reasoned that, if H.R. does not progress and if the sexualized and aggressive behavior continues, H.R. will have to be in a restrictive environment of some sort. The worst-case scenario is a hospital setting.

Michael Strouse, Executive Director of Community Living Opportunities, Inc., which provides services to mentally retarded people, testified for plaintiff regarding the cost of supervised living. Strouse stated that the cost of a semi-independent group home would be $30-$60 per day. The cost of 24 hour supervision which may be required for a Down's syndrome individual exhibiting excessive aggressiveness and excessive masturbation, would be $150 to $225 per day.

An economist, John Morris, appeared for plaintiff. Morris calculated the present value of the increased cost of care of H.R. from age 18 to her life expectancy of age 50. He used a figure

of $100 per day as increased cost of care and estimated the present value at $1.2 million.

## (H) Future Wage Loss

Dr. Milner acknowledged that H.R. would not be able to work in a sheltered workshop if she could not control her aggressive and sexualized behavior. Dr. Milner did not know whether this behavior could be controlled, but all attempts so far have not worked.

Morris calculated the present value of estimated loss of earnings at $200,000 to $300,000. He based this estimate on a 40-hour work week using two levels of minimum wage, $3.35 per hour and $4.55 per hour, and on a life expectancy of age 50.

The awarded elements of damages and amounts are supported by the evidence with the exception of future pain and suffering ($100,000).

Evidence of mental suffering generally should not be considered to support an award of future pain and suffering (which should be limited to physical pain and suffering) when the verdict form also provides a category for mental anguish. See *Leiker v. Gafford*, 245 Kan. 325, 342, 778 P.2d 823 (1989).

It appears the trial court submitted the K.S.A. 1990 Supp. 60-249a itemized verdict form to the jury. The jury is to be instructed only on the items of damages upon which there is evidence to base an award. K.S.A. 1990 Supp. 60-249a(c). There is no evidence of future pain and suffering (special verdict form, item [B]). The verdict is reduced by $100,000. See *Williams v. Withington*, 88 Kan. 809, 816, 129 Pac. 1148 (1913).

We have held, in an action for unliquidated damages, that a plaintiff must either consent to a reduced verdict or receive a new trial. *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 276, 553 P.2d 254 (1976). Under the facts of this case, the use of the itemized verdict form negates our traditional requirement of plaintiff's consent to a reduced verdict.

Davidson did not appeal. Plaintiff's judgment against Davidson is not affected by the instant appeal.

We remand to the trial court to enter judgments:

(1) For plaintiff against S.T.S. and U.S.D. in the amount of $1,700,000.

(A) For plaintiff against S.T.S. in the amount of $510,000.

(B) For plaintiff against U.S.D. in the amount of $1,190,000.

(2) For U.S.D. against S.T.S. on the U.S.D. cross-claim in the amount of $1,190,000.

Affirmed in part, reversed in part, and remanded.

HOLMES, C.J., not participating.

LOCKETT, J., concurring and dissenting: I respectfully dissent from the majority's determination that K.S.A. 1990 Supp. 38-1522 does not provide a private right of action.

I must again dissent from the majority's departure from our prior decisions and the common law by determining the legislature did not intend to grant a private right of action when enacting K.S.A. 1990 Supp. 38-1522. See *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985), for prior dissent. The majority bases its decision in part on *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 740 P.2d 606 (1987), and the fact that the legislature did not expressly authorize a private right of action when that statute was enacted or revised in 1983, 1986, 1987, and 1988.

First, the majority misapplies *Greenlee* to the facts of this case. In *Greenlee*, a former county highway employee brought an action against the board of county commissioners for wrongful termination. Greenlee claimed he was terminated because the commissioners' reckless or intentional violation of the cash basis law resulted in loss of his job. In *Greenlee*, we noted the test of whether a person injured by the alleged violation of the cash basis law may recover from a wrongdoer in a private action in tort is whether the legislature intended to afford such a right when enacting the cash basis law. We observed that the purpose of the cash basis law is to prevent a deficit in the funds at the end of the fiscal year. We determined that the legislative purpose of the cash basis law was to protect the public from government overspending and was not intended to provide government employees with job security.

Here, there is no doubt that the legislature, by enacting 38-1522, intended to protect children. The rationale of *Greenlee*, therefore, does not apply.

The majority's determination that the legislature did not intend to authorize a private right of action when K.S.A. 1990 Supp. 38-1522 was enacted or revised in 1983, 1986, 1987, and 1988 is flawed. It reasons that, if the legislature intended a private right of action when enacting a statute that creates a duty, the legislature would have so stated. This reasoning departs from our prior common-law rule regarding a breach of a statutory duty.

It has long been the law of Kansas that negligence exists where there is a breach of a duty and there is a causal connection between the breach of the duty and the injury received. *Rush, Adm'x, v. Mo. Pac. Rly. Co.*, 36 Kan. 129, 135, 12 Pac. 582 (1887). The first requisite in establishing negligence is to show the existence of the duty which it is alleged has not been performed. A duty may be general and owing to everybody, or it may be particular and owing to a single person only by reason of that person's peculiar position. In order to justify a recovery, it is not sufficient to show that the defendant has neglected some duty or obligation existing at common law or imposed by statute, but that the defendant has neglected a duty or obligation which it owes to the party who claims damages for the neglect. *Express Co. v. Everest*, 72 Kan. 517, 522-23, 83 Pac. 817 (1906).

In *Kendrick v. Atchison, T. & S. F. Rld. Co.*, 182 Kan. 249, 320 P.2d 1061 (1958), the plaintiff claimed that the railroad's train failed to sound its whistle at the crossing as required by law. The *Kendrick* court discussed the distinction between negligence and negligence per se. The court observed that "negligence per se" usually consists of the violation of a specific requirement of law or ordinance. It noted that the distinction between "negligence" and "negligence per se" is the means and method of ascertainment, in that negligence must be found by the jury from the evidence, while negligence per se results from violation of the specific requirement of law or ordinance, and the only fact for determination by the jury is the commission or omission of the specific act inhibited or required. The court recognized that we follow the rule that while a breach of duty imposed by law or ordinance is negligence per se, liability in damages cannot be predicated on a violation of law or ordinance unless the breach is the proximate cause of the injury or damages or substantially

contributes to them. *Kendrick* at 260. See *Clark v. Mo. Pac. Rly. Co.*, 35 Kan. 350, 11 Pac. 134 (1886).

We have long recognized a duty may be general and owing to everybody, or it may be particular and owing to an individual by reason of that person's position. The majority of our tort law is premised on uniform traffic laws or other statutes that restrict or require certain conduct or acts. In *Gabel v. Hanby*, 165 Kan. 116, 193 P.2d 239 (1948), we held that the operator of a vehicle upon a public highway may assume that others driving the highway will observe the law. We noted that mere violations of the statutes regulating traffic on the highways, such as excessive speed, insufficient signals, and other matters of similar nature, are not sufficient to make a driver of an automobile liable for negligence in an action for damages growing out of a collision, unless it appears that such violations contributed to the accident and were the legal cause of the injuries sustained.

Certain of the uniform traffic laws have been amended, others repealed, and new traffic laws enacted during every legislature since the uniform laws were first enacted. We still recognize that negligence exists where there is a breach of a traffic law and a causal connection between the breach of the duty and the injury received, even though the legislature has always prescribed the penalty but has never expressly incorporated a private right of action into the law.

It is important to note that when the legislature has intended not to grant a private right of action when enacting a statute to protect the public, it has specifically stated its intent. For example, when the legislature enacted the child passenger safety statutes, K.S.A. 8-1343 *et seq.*, in 1981 it required children of certain ages to be placed in safety restraining systems. K.S.A. 8-1344. In 1984, the legislature made it unlawful for any driver to violate K.S.A. 8-1344 and provided a fine of $10 for each violation. L. 1984, ch. 38, § 2. The legislature amended K.S.A. 8-1345 in 1989 to state that evidence of failure to secure a child in a child passenger safety restraining system under the provisions of K.S.A. 8-1344 shall not be admissible in any action for the purpose of determining any aspect of comparative negligence or mitigation of damages. L. 1989, ch. 40, § 2.

In *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980), when determining whether comparative negligence applied, this court noted there was a private right of action for personal injuries where liability was premised upon violation of a statute prohibiting sale of explosives to minors. The plaintiff's cause of action was predicated upon K.S.A. 21-4209, which prohibited anyone from knowingly selling, giving, or otherwise transferring any explosive or detonation substance to a person under 18 years of age. The *Arredondo* court recognized that a breach of duty, *negligence per se*, results from a finding that the statute was violated. It observed that liability follows a breach of a statutory duty if the violation is the proximate cause of the injury. The court recognized in the usual negligence per se case plaintiff's contributory negligence had been a defense. It noted that courts have found legislative intent to remove contributory negligence as a defense when the statute violated is one of two exceptional types: (1) the statute expressly removes the defense, as in the Federal Employers' Liability Act; and (2) such intent is found in the statute's character, its social purpose, and the background of the social problem and hazard to which it is directed, such as the child labor laws. The court concluded that comparative negligence applied when determining the percentage of fault of the parties. Justice Herd dissented, stating the statute operated to protect a class of persons traditionally protected under the law, namely, minors, even from their own inexperience, lack of judgment, and tendency toward negligence, and comparative negligence should not apply. 227 Kan. at 850.

The rationale of the *Arredondo* court that a breach of K.S.A. 21-4209 provided a private right of action should be applied to K.S.A. 1990 Supp. 38-1522. The purpose of each statute is to protect children. Each statute provides a criminal penalty. When enacting K.S.A. 1990 Supp. 38-1522, our legislature intended to authorize a private right of action, or it would have stated otherwise.